ATTORNEY GRIEVANCE COMMISSION OF
MARYLAND *v.* LEONARD
H. LOCKHART

[Misc. Docket (Subtitle BV) No. 20, September Term, 1978.]

*Decided July 25, 1979.*

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.

*William W. Cahill, Jr.,* for Leonard H. Lockhart.

*W. Newton Jackson, 3d, Special Assistant Bar Counsel,* for Attorney Grievance Commission of Maryland.

SMITH, J., delivered the opinion of the Court.

Bar Counsel, acting on behalf of the Attorney Grievance Commission of Maryland, filed a petition with us charging that Leonard H. Lockhart, a member of the Bar of this State, had violated Disciplinary Rules 1-102 (A) (1), (4), and (6); 5-105 (A), (B), and (C), and 6-101 (A) (3).[1] He also claimed that

---

1. We set forth the various disciplinary rules to which reference has been made:

DR 1-102 Misconduct.

(A) A lawyer shall not:

    (1) Violate a Disciplinary Rule.

          * *

    (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.

          * * *

    (6) Engage in any other conduct that adversely reflects on his fitness to practice law.

DR 5-105 Refusing to Accept or Continue Employment if the Interests of Another Client May Impair the Independent Professional Judgment of the Lawyer.

(A) A lawyer shall decline proffered employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by the acceptance of the proffered employment, except to the extent permitted under DR 5-105 (C).

(B) A lawyer shall not continue multiple employment if the exercise of his independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5-105 (C).

(C) In the situations covered by DR 5-105 (A) and (B), a lawyer may represent multiple clients if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each.

Lockhart disobeyed Maryland Code (1957, 1976 Repl. Vol.) Art. 10, § 44 (enacted by Chapter 621 of the Acts of 1968) relative to the duty of an attorney concerning funds of others entrusted with him, and Code (1974) § 7-106 (b), Real Property Article (originally enacted by Chapter 726 of the Acts of 1968) concerning mailing or delivering evidence of a recorded release of a mortgage or deed of trust.[2] Pursuant

DR 6-101 Failing to Act Competently.

(A) A lawyer shall not:

(1) . . .

\* \* \*

(3) Neglect a legal matter entrusted to him.

2. These statutes provided in pertinent part:

**§ 44. Duty of attorney.**

(a) If any attorney is entrusted with, or receives and accepts, or otherwise holds, deposits moneys or other trust moneys, of whatever kind or nature, such moneys, in the absence of written instructions or court order to the contrary shall be expeditiously deposited in an account maintained as a separate account or accounts for funds belonging to others. In no event shall he . . . use any such funds for any purpose other than the purpose for which such funds were entrusted to him.

(b) Any attorney wilfully violating the provisions of this section shall be charged with professional misconduct, malpractice, or conduct prejudicial to the administration of justice and shall be proceeded against for reprimand, suspension, or disbarment under any applicable provision of this article or any other law or the Maryland Rules.

(c) Any attorney wilfully violating the provisions of this section, in addition to the penalties set forth in subsection (b) hereof, shall be guilty of a misdemeanor for each such violation and on conviction thereof, shall be fined not more than five thousand dollars ($5,000.) or be imprisoned for not more than five (5) years, or both in the discretion of the court.

**§ 7-106. Releases.**

(a) . . .

(b) *Mailing or delivering evidence of recorded release of mortgage or deed of trust.* — (1) Subject to the provisions of subsection (5) a person who has undertaken responsibility for the disbursement of funds in connection with the grant of title to property, shall mail or deliver to the vendor and purchaser in the transaction, the original or a photographic, photostatic, or similarly reproduced copy of the recorded release of any mortgage or deed of trust which the person was obliged to obtain and record with all or part of the funds to be disbursed. If the original or copy of a recorded release is not readily obtainable at the time of recording, the person may mail or deliver to the purchaser or vendor the original or a copy of the court's recordation receipt for the release, or any other certified court document clearly evidencing the recordation of the release.

to Maryland Rule BV9 b the matter was sent to the Circuit Court for Kent County for hearing. The Honorable George B. Rasin, Jr., Chief Judge of the Second Judicial Circuit of Maryland, was designated to conduct this proceeding.

After a full hearing Judge Rasin submitted to us a lengthy and well reasoned report and opinion. His findings of fact are attached as an appendix to this opinion.

---

(2) The required evidence of a recorded release shall be mailed or delivered to the vendor and purchaser within 30 days from the delivery of the deed granting title to the property. However, if the recording of the release is delayed beyond the 30-day period for causes not attributable to the neglect, omission, or malfeasance of the person responsible for the disbursement of funds, a letter explaining the delay shall be mailed or delivered to the vendor and purchaser within the 30-day period, and the person shall mail or deliver to the vendor and purchaser the required evidence of the recorded release at the earliest opportunity. The person shall follow the procedure of mailing or delivering a letter of explanation every 30 days until the required evidence of a recorded release is mailed or delivered to the purchaser and vendor.

.J ₩ ₄

(5) Unless specifically requested to do so by either the purchaser or the vendor, a person responsible for the disbursement of funds in a closing transaction is not required to provide the purchaser or vendor with the required evidence of a recorded release if the person properly disburses all funds entrusted to him in the course of the closing transaction within five days from the date of the delivery of any deed granting title to the property.

These statutes were enacted as a result of the scandal which arose in the Washington metropolitan area relative to delayed real estate settlements. It had been the practice in Prince George's and Montgomery Counties, unlike that prevailing in the other 21 counties of Maryland and in the City of Baltimore, for actual disbursements in many instances to be made some weeks after execution of deeds, mortgages, or deeds of trust. Many lenders failed to advance funds until they were advised at a time subsequent to recordation of their liens that their instruments carried the expected priority. Interest, however, dated back to the time of execution of the instrument. Sellers continued to be responsible for interest on liens on their land until the date the settlement attorney actually paid their lender, notwithstanding the fact that they previously had conveyed away this land. This practice made it easier for some unscrupulous attorneys to embezzle from their escrow accounts. *See, e.g.*, Gordon v. State, 14 Md. App. 245, 286 A. 2d 833, *cert. denied*, 265 Md. 737 (1972), and Gordon v. State, 5 Md. App. 291, 246 A. 2d 623 (1968), *cert. denied*, 252 Md. 730 (1969). This situation caused the Maryland Legislative Council in 1967 to appoint a subcommittee under the chairmanship of the Honorable Elroy C. Boyer of Kent County to study these real estate settlement practices. The then president of the Maryland State Bar Association was requested to appoint, and did appoint, certain Maryland lawyers to serve on this subcommittee.

Crystal Beach Manor, Inc., owned a waterfront development in Cecil County known as Crystal Beach Manor.[3] Its land was subject to three deeds of trust.[4] Apparently plans were made to convey a number of small lots containing 2,000 - 3,000 square feet of land. Many of these sales were to individuals who had leased the lots conveyed for a number of years. Lockhart was counsel for Crystal Beach Manor, Inc.; its parent corporation, Exten Associates, Inc.; and Gerald M. Exten, who owned or controlled the stock of Exten Associates.

Lockhart established a special escrow account for this series of transactions. As settlements took place the funds derived therefrom were placed in this account. He did not procure a release of prior liens for each lot as it was sold. He apparently left to Exten the task of obtaining releases from these deeds of trust for the lots conveyed. Title insurance policies were issued to purchasers and possibly some mortgagees after each settlement. They did not reflect that the land so covered was subject to these three deeds of trust. Funds were withdrawn from the escrow account at Exten's direction. Payments were made from the account on obligations of Exten and his corporations and for other matters unrelated to the settlements in question.

There had been an agreement with the Crystal Beach Manor lienholders by which a specified amount of land was to be released at a certain dollar figure per acre. A computation was made long after many of the settlements as to the number of acres previously conveyed. Disbursement was then made to the lenders upon the basis of the per acre release rate.[5] There came the time when Exten's house of

---

3. This is the same subdivision which was involved in Parker v. T & C Dev. Corp., 281 Md. 704, 381 A. 2d 679 (1978).

4. One deed of trust had typed into it (as distinguished from that which was in the printed form) a provision which said, "The within loan is not assumable and a transfer or conveyance of the property described herein, *or any part thereof,* to any other person or entity, shall immediately accelerate the maturity date of the note hereby secured." (Emphasis added.)

5. It is argued that it was necessary because of the small amount of land involved to wait for disbursements to the lien holders and obtaining the releases until a substantial amount of land had been sold. At the time the agreement was entered into between Crystal Manor and the lenders relative to release Crystal represented to the lenders that the sales were imminent.

cards collapsed. There was not then in the escrow account a sufficient amount of money to procure releases of liens on a number of lots which Crystal Manor had conveyed. These transactions had taken place in the office of Lockhart. In each instance he had certified to a title insurance company that these titles were free and clear of liens, aside from those which were purchase money mortgages of the lot purchasers.

Judge Rasin made the following conclusions:

The Court finds the following violations of the Disciplinary Rules and the Maryland Code:

1. Disciplinary Rule 5-105 (A) and (B)
   Respondent demonstrated that his first

---

It may have been more convenient for Lockhart to prepare one long instrument of release listing many conveyances. Convenience is no answer, however. Judge Rasin mentioned one method involving escrow which might have been used. A simple method would have been to have had the trustees of the deeds of trust to join in each deed for the purpose of releasing their liens, with payment then made for the fraction of an acre represented. We point out that when settlement was made with the various lenders an even number of acres was not involved. The exact acreage (including a fraction) was multiplied times the release rate to determine the amount to be paid. Although it might have been less convenient to Lockhart or Exten, such computation could just as well have been done with each conveyance.

It is noteworthy that the agreement between the title agency controlled by Lockhart and his partners and the title insurance company involved specifically provided in pertinent part as to the duties of its agent:

(d) To issue reports of title, title binders and title policies in accordance with the information contained in the applications and abstracts of title produced by AGENT or filed with AGENT in satisfactory form promptly after such filing;

(e) Before final closing or settlement (1) to secure, on behalf of COMMONWEALTH, appropriate evidence justifying the removal of all objections set out in the binder or report of title, except those not insured against, (2) . . . and (3) to retain evidence justifying the removal of all objections removed, which evidence may be inspected by COMMONWEALTH at its option;

(f) As AGENT for COMMONWEALTH to record all papers which should be recorded, to make payment out of escrow funds of all obligations which constitute liens on the property (out of settlement funds) and to be responsible for the satisfaction of such liens of record;

(g) All funds deposited with AGENT shall be deposited in a separate Escrow Account. The acceptance of such funds by the AGENT shall be done for the immediate disbursement of such funds in the normal course and conduct of real estate transactions. It is not to be construed that the AGENT is authorized to accept deposit of escrow funds to be held over an extended period of time, the disbursement of which is contingent upon events after the closing of the transaction and issuance of policy of title insurance.

allegiance was to Gerald Exten and Exten Associates, Inc., which adversely affected the exercise of his independent professional judgment in behalf of the purchasers of the lots from Crystal Beach Manor, Inc., an alter ego of Gerald Exten. He should not have undertaken representation of the purchasers in the purchase of their lots. Furthermore, he should not have continued his representation knowing full well he was placing the interests of Gerald Exten before that of the purchasers.

2. Disciplinary Rule 1-102 (A) (4)

Respondent was involved in misrepresentation when he issued title insurance policies certifying there were no liens — other than purchase money mortgages — when in fact there were deeds of trust which were unreleased as to the lots conveyed at the time of settlement and the issuance of the title policies.

3. Disciplinary Rule 6-101 (A) (3)

Respondent neglected legal matters entrusted to him by the purchasers of the lots when he failed to obtain releases of the deeds of trust covering the lots at the time of the conveyances. Even assuming that it was not possible — or convenient — to obtain individual releases as to each of the lots conveyed — and this Court does not find such contention tenable — he owed the purchasers the duty to follow up with Gerald Exten to ascertain that the releases were obtained and recorded. Furthermore, Respondent admitted at the hearing that he had been neglectful.

4. Maryland Code, Article 10, Section 44

Although Respondent established an

escrow account and deposited funds therein which accrued from the sale of the lots, he used the funds for purposes other than the purpose for which the funds were entrusted to him. His disbursement of funds from the escrow account at the direction of Gerald Exten, at times when there were unsatisfied liens on the lots which had been conveyed and title policies issued, must be deemed a wilfull act on the part of Respondent. Not until the liens of the deeds of trust had been released as to the lots conveyed should any of the funds in the escrow account have been disbursed to or for the benefit of Gerald Exten.

5. Maryland Code, Real Property Article, Section 7-106 (b)

Respondent candidly admitted that he was unaware of this particular statute requiring him to mail or deliver to the vendor and purchaser in a real estate transaction the original or a photographic, photostatic or similarly reproduced copy of the recorded release of the deed of trust, the original or a copy of the court's recordation receipt for the release or any other certified court document clearly evidencing the recordation of the release. Since this was not done, Respondent violated this statute.

In the summary to his opinion Judge Rasin said:

This Court finds by clear and convincing evidence: (1) that Respondent represented the vendor, purchaser and insurer of title in numerous real estate transactions; [6] (2) that at the time of the

---

**6.** Judge Rasin in his opinion took "judicial notice of the practice in the Second Judicial Circuit that it is not unusual for the same attorney to represent the seller, purchaser and mortgagee in a real estate transaction." Of course, this is not confined to the Second Circuit. *See, e.g.,* Annot.,

conveyances there were deeds of trust encumbering the title to the property conveyed; (3) that title policies were issued certifying there were no liens except for purchase money mortgages; (4) that releases of the deeds of trust were not obtained and recorded at the time of settlement in approximately 143 real estate transactions; (5) that the title company which relied on Respondent's title certifications sustained financial loss because of false certifications; (6) that disbursement of funds accruing from the various transactions were made for purposes other than satisfying liens which should have been released contemporaneously with the transfer of title; (7) that Respondent's conduct was wilful and with full knowledge of the facts and,

---

*Attorney and Client: Conflict of Interest in Real-Estate Closing Situations,* 68 A.L.R.3d 967 (1976), where it is stated:

> A problem for the attorney, and for representatives of the bar attempting to provide standards for guidance of the legal profession in this area, is that to require independent representation of all potentially conflicting interests would be impractical, requiring duplication of effort and greater expense on the part of individual clients, and a consequent increased cost to the public for legal services in real-estate transactions. On the other hand, to permit the representation of conflicting interests in the name of efficiency or economic necessity would interfere with the attorney-client relationship and with a client's right to expect an attorney to represent his interests to the fullest extent permitted by law. Thus, most canons of ethics are drawn so as to permit the representation of adverse interests if full disclosure is made of potential areas of conflict, and provided that there are no actual areas of conflict already existent between the parties. [*Id.* at 970.]

Also see Informal Opinion No. 923 4/26/66 and Informal Decision No. C-472 12/26/61 of the Standing Committee on Professional Ethics of the American Bar Association. In the 1966 opinion the comment was made, "Where an attorney is acting as escrow agent *with the consent* of both parties we do not believe an ethical problem is presented." (Emphasis in original.) In the 1961 opinion the committee said, "Clearly it would be improper under [Canon 6] for an attorney to represent both the purchaser and the seller, or the purchaser and lender, without full disclosure of the facts and consent by all parties." Present Canon 5 is to the effect that a lawyer should exercise independent professional judgment on behalf of a client.. The series 5 disciplinary rules are applicable to it. Canon 5 is derived, in part at least, from former Canon 6 to which reference was made in the opinion we have just quoted. DR 5-105 (C) specifies, "[A] lawyer may represent multiple clients if it is obvious that he can adequately represent the interests of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each."

therefore, in violation of the Code of Professional Responsibility and those provisions of the Maryland Code heretofore enumerated.

At argument before us counsel for Lockhart conceded the correctness of Judge Rasin's conclusions Nos. 1, 2, 3, and 4. He said he *assumed* as to 5 that the title company which relied on Lockhart's title certification sustained financial loss because of false representations. Whether this title insurance company ultimately sustained financial loss is unimportant for the purpose of our decision. There is clear and convincing evidence that it had a substantial potential liability because Lockhart had falsely certified there were no liens. Counsel said he agreed with No. 6, that disbursements from these transactions were made for purposes other than satisfying liens which should have been released contemporaneously with the transfer of title. He explained, however, that this happened at the direction of Exten. That is no defense. It may be that Lockhart found himself in an uncomfortable position when a client who had been the source of fees in a substantial amount desired that these escrow funds be applied for purposes other than that for which they were intended. He cannot relieve himself of his professional responsibility to the purchasers of the lots in question, to the title insurance company, and to the ultimate holders of the purchase money mortgages from the lot buyers by saying that Exten told him to do it, any more than one may relieve himself of criminal liability by saying that he was told by someone else to commit the act. Nor can he relieve himself of his obligation to procure releases of the liens at the time of each settlement by saying that he relied upon Exten. Lockhart was the lawyer. *He* was the one to whom the purchasers, their mortgagees, and the title insurance company looked for a clear title. It was *his* duty to obtain it. It likewise was *his* duty to guard *his* (not Exten's) escrow account. This meant it was improper for any disbursement unrelated to the settlements to be made until these liens had been satisfied, notwithstanding directions from Exten or directions on Exten's behalf for such disbursements.

Lockhart filed a number of exceptions to the findings of

fact and conclusions of law made by the trial judge. We shall not comment upon most of them because even if the trial judge erred on these matters, and we do not think he did, such error would in no way undermine his basic conclusion that Lockhart was guilty of professional misconduct when he falsely certified that purchasers were acquiring a title encumbered *only* by their own purchase money mortgages. However, we shall comment relative to his contention concerning DR 1-102 (A) (4). He says he did not violate this rule "because, with good intentions, he fully believed that the monies retained in the escrow account would always be adequate to release the liens." This assertion on his part completely overlooks the trial judge's finding, which was that he "was involved in misrepresentation when he issued title insurance policies certifying there were no liens — other than purchase money mortgages — when in fact there were deeds of trust which were unreleased as to the lots conveyed at the time of settlement and the issuance of the title policies." Moreover, it was his duty to obtain the release of liens at the time of settlement, not many months later.

We find Judge Rasin's conclusions to be supported by clear and convincing evidence. Thus, we are faced with the sanction to be imposed. There is no evidence here that Lockhart took funds from this escrow account for his own purposes, other than payment to him of fees to which he was legitimately entitled. If the money in his account had passed improperly to Lockhart, we ordinarily would disbar him forthwith without hesitation.

So far as we have been advised Lockhart's prior professional record is unblemished. Many times in recent years this Court has quoted from *Ex Parte Brounsall,* 2 Cowp. 829 (1778), what has come to be known as "the Lord Mansfield rule." It is to the effect that in disciplinary proceedings the inquiry is to whether after the conduct of such individual it is proper that he should continue to be a member of a profession which should stand free from all suspicion, such proceedings not being by way of punishment, but the court in such cases exercises its discretion whether a man whom they have formerly admitted to practice is a proper person to

be continued on the roll or not. By the same token, suspension is for the protection of the public, not by way of punishment of the individual lawyer. It is protection for the public because it demonstrates to members of the legal profession the type of conduct which a court will not tolerate without sanction.

Settlement lawyers in effect representing all interests, as did Lockhart, must recognize that they have a special duty to all parties to the settlement. This duty includes prompt obtention of appropriate releases of liens. It also includes prompt and proper disbursement of all funds passing through their hands. Such lawyers may not abdicate this responsibility to the seller without the consent of the buyer, the buyer's mortgagee, and the title insurance company insuring the buyer and his mortgagee.

It must be noted that Judge Rasin in his summary said relative to the violations which he found of the Code of Professional Responsibility and Maryland statutes that Lockhart's "conduct was wilful and with full knowledge of the facts . . . ." There was clear and convincing evidence to support this conclusion. In other words, Lockhart's violations were not the result of mere oversight nor were they brought about by negligence arising from alcohol or drug abuse. We must take all of this into consideration in meting out a sanction.

Leonard H. Lockhart shall stand suspended from the practice of law in this State for the period of one year accounting from 30 days from the date of this opinion. He shall stand suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

> *It is so ordered; respondent shall pay all costs, including all costs of transcripts, pursuant to Maryland Rule BV15 c.*

## APPENDIX

## FINDINGS OF FACT

Respondent was admitted as a member of the Bar of the Court of Appeals of Maryland in 1955, and from 1971 through 1978 maintained an office for the practice of law in Elkton, Maryland.

From July 2, 1971, to July 1, 1974, Crystal Beach Manor, Inc., a Maryland Corporation, was the owner of a waterfront development known as Crystal Beach Manor, consisting of approximately 205 acres of land, situate in the First Election District of Cecil County, Maryland. A portion of the property owned by Crystal Beach Manor, Inc. was divided into small lots. The lots which are pertinent to this inquiry were all occupied by persons who had previously leased them from Crystal Beach Manor, Inc. or its predecessors in title. During the period that Crystal Beach Manor, Inc. owned this property it was a wholly owned subsidiary of a corporation known as Exten Associates, Inc., which in turn was solely owned by Gerald M. Exten.

Crystal Beach Manor, Inc. imposed three deeds of trust on the development known as Crystal Beach Manor as follows:

(a) The first, dated July 2, 1971, to Edward W. Nylen and Lance W. Billingsley, Trustees for National Mortgage Corporation, in the principal amount of $525,000.00, and recorded among the Land Records of Cecil County, in Liber W.A.S. No. 273, Folio 197, etc.,

(b) The second, dated December 21, 1972, to Ellis N. Jones and Jessie Hilderbrand, Trustees for MFS Service Corporation, in the principal amount of $700,000.00, and recorded among the Land Records of Cecil County in Liber W.A.S. No. 302, Folio 357, etc., and

(c) The third, dated May 7, 1973, to Lance W. Billingsley and William V. Meyers, Trustees for National Mortgage Corporation, in the principal amount of $300,000.00, and recorded among the

Land Records of Cecil County in Liber W.A.S. No. 312, Folio 99, etc.

Respondent represented Gerald Exten, Exten Associates, Inc., and Crystal Beach Manor, Inc. at the time the ownership of Crystal Beach Manor was acquired in 1971. He continued to represent all of them through July 1, 1974. Respondent was the secretary of Crystal Beach Manor, Inc., during this period for the sole purpose of having his name used as a resident of Cecil County in order to obtain an alcoholic beverage license. He did not take an active part in the management of the affairs of Crystal Beach Manor, Inc.

During 1973 and 1974 Crystal Beach Manor, Inc., engaged in a course of action to effect the sale of lots to those persons who occupied them under the lease agreements. Arrangements were made for the Respondent, or persons associated with him and his law firm, to conduct settlements on the sales of approximately 143 lots at Crystal Beach Manor. Respondent (or attorneys associated with him) acted as attorney for purchasers of the lots. Included among the settlements were 52 lots enumerated in a partial release of deed of trust dated March 25, 1975, and recorded among the Land Records of Cecil County in Liber W.A.S. No. 344, Folio 61, etc., after the deeds had been executed in 1973 and 1974.

The MFS deed of trust did not specifically provide for the release of individual lots from its lien. However, by letter dated December 20, 1973, MFS agreed to release certain acreage in Crystal Beach Manor, out of which the lots were conveyed, upon payment of principal in the amount of $6,250.00 and the execution of a first trust note of $6,250.00 bearing interest at the rate of 8% or better for a period of five to ten years per each acre to be released. These notes were to be subject to the approval of the Corporation. The trust notes could cover either the lots being conveyed or any other property.

By letter dated December 4, 1973, to Gerald M. Exten, National Mortgage Corporation agreed to release certain acreage in Crystal Beach Manor, out of which the lots were conveyed, from the lien of its deed of trust, upon payment of

$2,000.00 for each acre to be released. The letter also provided that "any interest now due on notes secured by those mortgages is also paid". The letter further called Mr. Exten's attention to the date when the interest was due and the amounts thereof and further stated that National Mortgage Corporation understood Mr. Exten would bring current all interest due on any of his loans from Crystal Beach Manor, Inc. before the year end and failing that he would assign as additional collateral all that paper resulting from the sale of lots at Crystal Beach.

Three payments of principal were made of MFS deeds of trust as follows:

    January 16, 1974 — $50,000.00
    February 14, 1974 — $42,375.00
    March 25, 1975 — $53,950.00

Upon receipt of the $42,375.00 payment by MFS on or about February 14, 1974, a release of liens as to 92 lots in Crystal Beach Manor, comprising approximately 6.7903 acres, was executed February 13, 1974, and recorded among the Land Records of Cecil County on March 6, 1974, in Liber W.A.S. No. 329, Folio 119, etc.

After the payment of $53,950.00 on or about March 25, 1975, MFS Service Corporation executed on the same date another release of liens on 52 lots in Crystal Beach Manor comprising approximately 4.3164 acres. This release was recorded among the Land Records of Cecil County in Liber W.A.S. No. 344, Folio 161, etc. Deeds conveying some of these 52 lots had been recorded in early 1974 and thus remained subject to the MFS deed of trust for approximately one year.

National Mortgage Corporation received no payments of principal on its deeds of trust until some time in March of 1975. Shortly thereafter it executed two releases as to 143 lots in Crystal Beach Manor. All of the deeds to these lots had been executed and recorded prior to the recording of the releases of the deeds of trust. The liens of the two deeds of trust were, therefore, unsatisfied for at least a year after individual purchasers had taken title.

In 1971 Respondent was designated as an approved

attorney by the Commonwealth Land and Title Insurance Company (Commonwealth) for the purpose of writing title policies for that Company. Thereafter Respondent and his law partner organized the Northeastern Maryland Title Co., Inc., (Northeastern) with Respondent acting as president, and an agency agreement dated May 1, 1974, was executed by Commonwealth and Northeastern.

Paragraph 2 (f) of the agency agreement entered into between Commonwealth and Northeastern provided *inter alia* that Northeastern, as agent, would make payment out of escrow funds of all obligations which constituted liens on the property and would be responsible for satisfaction of such liens of record.

Paragraph 2 (g) of said agreement provided *inter alia* that Northeastern, as agent, would deposit settlement funds in a separate escrow account and that such funds would be disbursed in the normal course of conduct of real estate transactions.

During the years 1973 and 1974, as agents for Commonwealth, Respondent and Northeastern issued approximately 130 owner's title insurance policies to various lot purchasers at Crystal Beach Manor certifying that said lots were free and clear of any liens — except purchase money mortgages. This, of course, would have included the deeds of trust of MFS Service Corporation and National Mortgage Corporation, when in fact said lots were encumbered by such liens, of which Respondent was aware at the time the title policies were issued.

Around May of 1974 Exten's enterprises, including Crystal Beach Manor, Inc., ran into financial difficulties. In July of 1974 Crystal Beach Manor, Inc., filed for Chapter 11 reorganization and remained a debtor in possession. Crystal Beach Manor, Inc., was subsequently adjudicated bankrupt in 1974.

In June of 1974 Crystal Beach Manor, Inc., became delinquent on its obligation to MFS. In early November 1974 MFS became aware of Mr. Exten's financial difficulties when he told someone at MFS he had a financial problem and would pay as soon as he could. National Mortgage Corporation

communicated with MFS to discuss the Exten problem. On November 20, 1974, representatives of MFS and National Mortgage Corporation held a meeting in Prince George's County in the office of the attorney for National Mortgage Corporation. Respondent was present at that meeting. Commonwealth had no knowledge of any unusual problems until November 1, 1974, according to its regional counsel and vice-president who testified at the hearing. It was at this time that Commonwealth learned the lots for which title policies had been issued in its name were still subject to deeds of trust.

As a result of considerable negotiations among all parties concerned Commonwealth paid out of its own funds the sum of $90,000.00 to National Mortgage Corporation and $33,036.00 to MFS Service Corporation. These payments were made to secure releases from the liens of the deeds of trust on approximately 143 lots which previously had been conveyed. Respondent had represented the purchasers and issued title insurance policies as agent for Commonwealth with respect to those lots. Commonwealth made the payments to MFS and National Mortgage Corporation to obtain releases of the deeds of trust on the lots which it had insured as to title.

Respondent contends that it was not his responsibility to obtain the releases of the deeds of trust on the approximately 143 lots conveyed, but that it was the responsibility of Mr. Exten, who had previous association with the lenders located in the Montgomery County area. He further contends that because the amount of money to be paid to the lenders for the releases of the deeds of trust was to be calculated on an acreage basis rather than per lot conveyed it was impossible to obtain releases with respect to each individual lot as it was sold.

Respondent maintained an escrow account designated "Leonard H. Lockhart, Attorney", at the National Bank of Perryville, located in Perryville, Maryland, subject to his sole withdrawal, for the purpose of Crystal Beach Manor settlements. Out of this account Respondent paid recording costs. Other payments from the account were made at the direction of Mr. Exten. Some of these payments were for

counsel fees for the Respondent and his law firm, for expenditures unrelated to settlement costs in connection with Crystal Beach Manor, Inc., and for the benefit of Mr. Exten's enterprises unrelated to Crystal Beach Manor, Inc. However, Respondent contends that at all times the conditions for release of the deeds of trust on the lots conveyed could have been met by payment of funds from the escrow account and assignment of purchase money mortgages, had the lenders complied with the original arrangements made for the releases; that is, for MFS, $6,250.00 in cash per acre and $6,250.00 in trust notes per acre, and for National Mortgage Corporation, $2,000.00 per acre. It is true that with respect to the 92 lots released by MFS on February 13, 1974, it did not require the $6,250.00 in trust notes with respect to the 6.7903 acres, thus deviating from its original requirement.

Respondent further contends it was only because both lenders increased their demands for payment on the principal that it was impossible for Crystal Beach Manor, Inc., to obtain the releases with respect to the lots that had been sold. The Court finds as a fact that the lenders did indeed demand increased payments, but not without justification — after they learned of Exten's financial predicament.

Commonwealth then sought reimbursement from the Respondent for the funds it had paid to National Mortgage Corporation and MFS Service Corporation. Although Respondent assumed personal responsibility vis-a-vis his law partners, satisfactory settlement with Commonwealth was not made in time to avoid the filing of an action against the Respondent by Commonwealth in the United States District Court for the District of Maryland seeking recovery of $123,036.00 which it had paid to National Mortgage Corporation and MFS Service Corporation as a result of title policies issued by Respondent on the lots at Crystal Beach Manor. Prior to the trial a settlement was concluded wherein Commonwealth was paid the sum of $115,000.00 by Respondent. Notwithstanding the payment of $115,000.00 to Commonwealth it sustained an out-of-pocket loss exceeding $20,000.00 including attorney's fees.

With respect to the escrow account, Respondent received

funds from Crystal Beach Manor settlements. These funds were generally derived from purchasers' down payments, settlement costs paid by purchasers, monthly payments made by purchasers on their purchase money mortgages prior to the assignment of the mortgages to the First National Bank of North East and cash received when mortgages were assigned to the North East Bank. Approximately $372,108.57 was deposited in the escrow account in 1973 and 1974. During this same period, Respondent — or persons employed by Respondent and subject to his direction — disbursed monies from the escrow account for purposes totally unrelated to Crystal Beach Manor in excess of $25,000.00. The amount is incapable of being precisely determined. In addition Respondent disbursed approximately $27,000.00 from the escrow account to himself or his law firm for services rendered. Of this amount $4,200.00 was for legal services in connection with Lake Side Park, North East, another real estate development of Exten, and $1,600.00 for rental of a sales office used by both Lake Side Park and Crystal Beach Manor, Inc.

## FURTHER FINDINGS

With respect to the escrow account, the Court finds there were no specific instructions with respect to disbursement of funds received by the Respondent and deposited in the escrow account. Since Respondent represented both the buyers and seller he became a stake holder for both with responsibility to both. The Court believes it was Respondent's primary responsibility to hold or expend the funds or see to the application of the funds for the benefit of the purchasers to assure that they received an unencumbered title.

With respect to the allegation that Respondent violated Section 7-106 (b) of the Real Property Article, which calls for some type of notice to a purchaser that a lien has been released, the Respondent quite openly and honestly admitted that he was unaware of such a provision and, therefore, did not comply with that section of the statute.

With respect to the practice of representing both purchaser

and seller in a real estate transaction, the Court takes judicial notice of the practice in the Second Judicial Circuit that it is not unusual for the same attorney to represent the seller, purchaser and mortgagee in a real estate transaction. Theoretically it may not be the best practice, but it has been the custom and still is the practice in this area. This custom requires an attorney to be a scrupulous representative of three distinct parties who may at times have conflicting interests. In simple transactions there appears to be no problem. However, in the transactions now under consideration the Court finds that it was impossible for an attorney to adequately represent a purchaser and certify an unencumbered title in a property settlement when he could not obtain an immediate release of deeds of trust on the property being purchased. This Court believes that notwithstanding the unusual difficulties in obtaining releases Respondent should not have undertaken representation of the purchasers if he did not assume responsibility to see that the existing liens on the lots were released upon the execution of the deeds and payment of the purchase money, whether payment was in full, in cash, or partial payment in cash and the execution of a purchase money mortgage for the balance. From the exhibits and testimony Respondent demonstrated he felt more responsible to Crystal Beach Manor, Inc. — Exten — than to the purchasers. It appears to the Court that if lots of much less than an acre were being conveyed and releases were to be obtained with respect to a number of lots on an acreage basis the method employed should have been to hold in escrow the deeds, title policies and money paid by the purchasers. The title policies should not have been issued until after the three liens of the two lenders had been released as to the lots conveyed in order that the purchasers could receive a clear title subject only to the purchase money mortgages. It is no excuse for Respondent to assert that there was no way these real estate transactions could have been handled to obtain releases as each lot was conveyed because the releases were to be on an acreage basis.

It is fortunate for the buyers that Respondent and Commonwealth Title Company ultimately supplied the

necessary funds to obtain the releases of the deeds of trust covering their lots. An attorney's responsibility to a client requires him to guard against unfortunate eventualities. An attorney should not risk his client's interest under such arrangements as had been made between Crystal Beach Manor, Inc. and the two lenders. Respondent should not have gambled that the purchasers would ultimately hold title to their lots free and clear of the liens the two lenders held on the tract out of which the lots were conveyed.

There are those who hold the view that a lawyer should not represent both buyer and seller in any real estate transaction. As a general rule this member of the Court does not find that such representation is a violation of the Code of Professional Responsibility so long as both buyer and seller are fully aware of the facts. It is only in an unusual situation such as the one involved in this proceeding that it is impossible for an attorney to provide the representation which any purchaser is entitled to receive. The attempt to comply with the arrangements between Mr. Exten and the two lenders was inimical to the interest of the purchasers.

Unfortunately, hindsight is always better than foresight. The Court concludes that Respondent did not intentionally get himself involved in this unfortunate situation. He assumed the deeds of trust would be released at a later date without the purchasers ever being aware of the facts and did not anticipate Mr. Exten's financial problems.

However, the Court is compelled to find that Respondent has run afoul of several Disciplinary Rules and provisions of the Maryland Code.