474 A.2d 1332

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Philip S. MARANO.**

**Misc. (BV) No. 22, Sept. Term, 1983.**

Court of Appeals of Maryland.

May 25, 1984.

Richard J. Hackerman, Baltimore, for respondent.

Glenn M. Grossman, Asst. Bar Counsel, Annapolis (Melvin Hirshman, Bar Counsel, Annapolis, on the petition), for petitioner.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

MURPHY, Chief Judge.

The Attorney Grievance Commission, acting through Bar Counsel, filed a petition for disciplinary action against Philip S. Marano, alleging violations of the Disciplinary Rules of the Code of Professional Responsibility. We referred the matter, pursuant to Maryland Rule BV9 b, to Judge Thomas Ward of the Circuit Court for Baltimore City to make findings of fact and conclusions of law. After conducting an evidentiary hearing, Judge Ward made the following findings:

"FACTS

"The Petitioner produced documentary evidence plus the testimony of Salvatore Glorioso and William Allen, Deputy Clerk of the Circuit Court of Baltimore County. The Defendant, Philip Marano, testified for himself.

"The facts revealed that Salvatore Glorioso had retained Mr. Marano over a considerable period of time for all his work because Mr. Marano spoke Italian, and Mr. Glorioso, being an Italian immigrant to the United States, felt comfortable with him. Included among the work for which Mr. Glorioso retained Mr. Marano was the sale of Glorioso's Groceries and Delicatessen, Inc. to Frank and Rosalie Scaccio, concerning which a contract was entered into in September of 1978 calling for the sale of the grocery business and

the accompanying beer and wine license for a purchase price of $18,000.00.

"The agreement was reduced to writing, and an advisory settlement date scheduled to occur after the license was transferred. In addition to the downpayment, the money was to be paid over a five (5) year period. If the license was not transferred, the price would be reduced $1,000.00. In addition to all of the above, all of the profits obtained from the sale of beer and wine on the premises while the license was pending transfer was to belong to the seller, Glorioso. The buyers were permitted to operate the business pending the settlement of the business and transfer of the license.

"Mr. Glorioso testified that he complained that Mr. Marano never told him when the license was transferred despite repeated calls. No accountings were made of monies received from the sale of beer and wine to Mr. Glorioso, in violation of the contract, despite numerous calls again from Mr. Glorioso to Mr. Marano. And, finally, Mr. Glorioso testified that in the spring of 1979 he learned that the grocery had burned up, and he called his attorney reporting the information to him, inquiring about the money, etc. Mr. Marano said don't worry about it, he would take care of it, and Mr. Glorioso was advised by Mr. Marano to pick up a check from the insurance company for the value of the lost inventory and business. Mr. Glorioso further testified that he did this, and, in fact, produced a check which he gave to Mr. Marano, but noticed that it was payable to "Little Sicily", the new name of the business as operated by Frank and Rosalie Scaccio, the buyers. The testimony was that despite the fact Mr. Marano was aware of the incorrect payee on the check in question, that for over a month he did nothing about it, until he later learned from Mr. Glorioso that the insurance company had either issued another check payable to Little Sicily, or somehow or another regained control of the check in question and paid it to them. In any event, the payees, buyers, that is, Frank and Rosalie Scaccio, received the sum of $17,600.00 as a result of the fire

occurring at what was formerly known as Glorioso's Groceries. Mr. Salvatore Glorioso was out according to the insurance company.

"In Mr. Marano's own testimony, he admits to substantially the facts as previously stated by Mr. Glorioso, and produced evidence that he had notified the fire insurance carrier of Glorioso's Groceries immediately after the contract in September, 1978, that the business was being sold, and asked the insurance company to enter as endorsements on the policy the protected interest of the purchasers, Little Sicily, as operated by Frank and Rosalie Scaccio.

"However, despite the fact that Mr. Marano had acted promptly in notifying the insurance company of the change of endorsement in protection of the contract purchasers in the spring of 1978, when he learned of the fire which occurred in the spring or May of 1979, he did nothing. He neither checked to see that the insurance company was notified, did not check to see whether or not the contract purchasers had fire insurance on the property, and he did not notify the insurance company and make a claim on behalf of his client, Salvatore Glorioso.

"In any event, Glorioso was out and Scaccio was in, and the only thing, according to Mr. Marano, to do was to enter suit, which he did finally in the Circuit Court of Baltimore County in Equity entitled *Glorioso's Groceries and Delicatessen, Inc. v. Frank Scaccio and Rosalie Scaccio,* his wife (Case No. 102477, Docket 140, Folio 135).

"Docket entries show suit was filed on November 15, 1979, the defendants filed a Demurrer to the Bill of Complaint on December 7, 1979, a hearing was held on the Demurrer on May 5, 1980, and that an Answer to the Bill of Complaint was filed on the 15th of May, 1980. A Rule 530 dismissal was entered in the case on November 9, 1981, leave to suspend for ninety days was granted on December 10, 1981, and the case was finally dismissed by order of court on May 20, 1982. A Petition was filed to again

suspend the dismissal under Rule 530, and Judge Raine refused to grant the Petition on June 11, 1982.

"No question was raised at the time of the hearing concerning a propriety of filing the case in Equity.

"The evidence showed that Mr. Marano did not request that the matter be placed on the Equity Docket for purposes of trial. Deputy Clerk William Allen of the Circuit Court of Baltimore County testified that he had been Deputy Clerk 28 years and supervisor of the legal department for the last 12 years with respect to the assignment of equity cases. He said from 1976 onwards it became necessary to request a hearing in equity cases when counsel desired to have cases heard on their merits. This case in question, the case of *Glorioso's Groceries, et al.* above referred to, was not, therefore, assigned a trial date during the time that it rested in the files of the Baltimore County Courthouse. Mr. Allen testified that most of the attorneys who practice in Baltimore County are familiar with this procedure.

"Cross examination of Mr. Allen revealed that mechanics liens cases are assigned without request because of the nature of the matter, but law cases are set in automatically. He further testified that the procedures for the change with respect to equity cases (that is, the rule that attorneys must request a hearing) was posted in The *Daily Record* in 1976. He further testified that if a case is dismissed under Rule 530, an attorney must request that it be placed back on the trial docket even though it had previously been on the trial docket.

"The record clearly shows that at no time did Mr. Marano request a trial date on behalf of the case in question either before or after the dismissal of Rule 530.

"There is no evidence to show that Mr. Marano did anything during the ninety day grace period between December 10, 1981 and May 20, 1982, when the case was finally dismissed.

"Meanwhile, as the months and years rolled by, Mr. Glorioso became extremely apprehensive, he testified, concerning the progress in the case, and he consulted with and retained another attorney to attempt to gain his money as a result of the sale of his grocery store on or before June of 1981. As a result of this, his new attorney filed suit on June 18, 1981, in the Circuit Court of Anne Arundel County against the Respondent, Philip S. Marano, which suit was eventually settled by Mr. Marano, making Mr. Glorioso whole and free of damage as a result of his alleged negligent practice.

"The bottom line in the case at hand was that Frank and Rosalie Scaccio were able to keep $17,600.00 of the proceeds from an insurance company (to this day it has never been clearly determined what insurance company paid Mr. and Mrs. Scaccio for the claim). Mr. Marano never checked to see whether or not Scaccio had insurance or whether it was Glorioso's own insurance company that had paid the claim. Mr. and Mrs. Scaccio were never compelled to ever make an accounting for the monies received from beer and wine sales during the pendency of the contract, up until the license was transferred (the license was eventually transferred, and Mr. Marano found out about it sometime afterwards); and, finally, the buyers, The Scaccio's, never had to pay Mr. Glorioso a penny, except for the deposit, for the purchase of the business in question.

"A second charge of misconduct against Philip Marano evolved out of Mr. Marano's allegedly being retained as attorney for the Estate of Jean R. Aronson.

"Apparently, Mr. Marano was retained as a result of the request of a fellow member of the Bar to assist in the administration of the Estate of Jean R. Aronson, the result of which resulted in Mr. Marano contacting the heirs of the Estate with respect to handling the probate work which had to be done. As a result of this, Mr. Marano made a claim for life insurance proceeds from Federal Employees Group Life Insurance Company for the benefit of Barton Aronson

and the Complainant against Mr. Marano, Lawrence D. Aronson.

"The facts reveal that Jean R. Aronson died on August 10, 1980, and that following that date certain Affidavits were obtained by Mr. Marano in September of 1981 indicating that Miss Aronson had no surviving husband at the time of her death. On February 8, 1982 Mr. Marano made claim under the life insurance policy for the proceeds due his clients. On March 14, 1982 Mr. Marano apparently received the funds.

"The facts in the hearing showed that after March of 1981, Dr. Lawrence Aronson and Barton Aronson dealt exclusively with Philip Marano concerning the claim for life insurance resulting from the Estate. Mr. Marano testified that he was deliberately delaying in the production of the funds in question because Mr. Barton Aronson had, according to Mr. Marano, become involved in certain dealings with the Estate which resulted in him owing money to his brother, Lawrence Aronson. Mr. Marano had hoped that by his delays in producing the checks from the life insurance company, that Mr. Barton Aronson could be persuaded to turn over his check to his brother. In any event this did not occur, and on July 30, 1981, Lawrence Aronson wrote Mr. Marano complaining about his failure to obtain his money. It was after the receipt of this letter that finally Mr. Marano on September 4, 1981, submitted Affidavits to be signed by Mr. Aronson with respect to the claim for the life insurance proceeds. Although the facts are not clear as presented at the hearing, apparently Barton Aronson, a considerable period of time after the Affidavits were forwarded to the insurance company, received his money somewhere around March of 1982. For some reason or another, Dr. Lawrence Aronson did not receive his share of the life insurance proceeds, and he continued to complain, including filing a complaint with the Attorney Grievance Commission of Maryland. As a result of this complaint, a hearing was scheduled on April 4, 1983, at which time Mr. Marano testified concerning the receipt of the life insurance pro-

ceeds. Mr. Marano testified before this Court that at that time he suggested that perhaps his file should be more closely examined to determine what happened to the check, and he referred to that on a subsequent occasion. This he did following the hearing, and found the check. After finding the check, which had been apparently resting in his file during the time when he was pending complaints of the Attorney Grievance Commission, he forwarded the check on to Dr. Lawrence Aronson.

## "CHARGES

"The charges brought by the Attorney Grievance Commission for disciplinary infractions of Rule 1–102 charging misconduct, Disciplinary Rule 6–101, charging failure to act competently, and Disciplinary Rule 7–101, charging Mr. Marano with failure to "represent a client zealously".

## "FINDINGS

"1. Complaint by Salvatore Glorioso.

"This Court finds that Mr. Marano, the Defendant herein, violated the following Disciplinary Rules:

Disciplinary Rule 1–102

'Misconduct.

(A) A lawyer shall not:

 (6) Engage in any other conduct that adversely reflects on his fitness to practice law.'

Disciplinary Rule 6–101

'Failing to Act Competently.

(A) A lawyer shall not:

 (3) Neglect a legal matter entrusted to him.'

Disciplinary Rule 7–101

'Representing a Client Zealously.

(A) A lawyer shall not intentionally:

 (3) Prejudice or damage his client during the course of the professional relationship, except as required under DR 7–102(B).'

"2. Complaint by Dr. Lawrence D. Aronson.

"This Court finds that Mr. Marano, the Defendant herein, violated:

Disciplinary Rule 6–101

'Failing to Act Competently.

(A) A lawyer shall not:

(3) Neglect a legal matter entrusted to him.'

"With respect to Charge 1 against the Defendant, Philip S. Marano, this Court finds that Mr. Marano violated Disciplinary Rules 1–102(A)(6), Rule 6–101(A)(3), and Rule 7–101(A)(3) with respect to his representation of Salvatore Glorioso in the matter of the sale of his grocery business, the matter of the claim or claims resulting from a fire which destroyed his former grocery, and the matter of filing suit against the buyers of the grocery, Frank and Rosalie Scaccio.

"More particularly, Mr. Marano failed to:

1. Act promptly, competently, and diligently with respect to the preparation of the settlement of the grocery store of Mr. Salvatore Glorioso with respect to his contractual agreement with Mr. and Mrs. Frank Scaccio.

2. Failed to properly account for all monies due to his client as a result of the sale of beer and wine products.

3. Failed to monitor and attend the license transfer.

4. Failed to place the matter down for prompt settlement.

5. Failed to properly protect his client with respect to the claim concerning fire damage.

6. Failed to learn which company actually paid the claim and whether or not it was one or two companys involved at the time of the claim. This matter still remains unknown. His handling of the entire matter of the insurance claim involved numerous lapses which this Court will not specifically itemize further.

7. Failure to promptly file suit, and conduct pretrial discovery and other matters necessary to prepare the matter for trial in Mr. Glorioso's claim against Mr. and Mrs. Scaccio.

8. Failure to request that the claim filed in the Circuit Court of Baltimore County be set upon the trial docket promptly, failure to monitor the progress of the case, and failure to competently represent his client throughout the proceedings instituted in Baltimore County.

"In addition to this, Mr. Marano's actions with respect to all of the above adversely reflect on his ability to practice law, which resulted in financial damage or prejudice to his client at the time that the lapses occurred.

"With respect to Charge 2 against the Defendant, Philip S. Marano, this Court finds that Mr. Marano violated Disciplinary Rule 6–101(A)(3) with respect to his representation of the Estate of Jean R. Aronson.

"With respect to the findings of this Court, that even if it is true that the lapses or lack of diligence on behalf of Mr. Marano with respect to his making a claim for life insurance proceeds on behalf of the heirs of the Estate of Jean R. Aronson were true and acceptable, there is no excuse given or givable for Mr. Marano's lapse and failure to act diligently and competently with respect to locating the proceeds which apparently had already been obtained by him from Federal Employees Group Life Insurance Company and was remaining in his file from the time that Mr. Marano received a complaint from the Attorney Grievance Commission of Maryland up to and including the time of hearing before the said Commission."

Marano did not except to any of Judge Ward's findings. He nevertheless maintains that the charges should be dismissed, or in the alternative, that a reprimand be issued. His recommendation is predicated on a number of factors, *i.e.*, his twenty-seven years of satisfactory service at the bar; his dedication to his client's interests; and his personal payment of a $30,000 malpractice judgment in Mr. Glorio-

so's favor. Marano says that he has adjusted his manner of practicing law, that he no longer takes all cases offered to him; that he has now engaged an associate to work with him in his office; and that he now manages to work more diligently on a reduced case load. Marano also points out that he is now taking educational courses to improve the management of his law office. He says that his health has been impaired since 1977 and that he has been laboring under a severe strain caused by a personal family tragedy. Marano suggests that his representation of clients poses no danger to the public. Consequently, he argues that a suspension would constitute punishment for violation of the disciplinary rules, which is inconsistent with the prevailing view of lawyer disciplinary proceedings.

Bar Counsel recommends that Marano be suspended from the practice of law for at least a thirty-day period. He contends that Marano's misconduct was gross and involved numerous lapses of diligence, resulting in particular prejudice to Mr. Glorioso. Bar Counsel advises that Marano received a private reprimand in June of 1976 for failing to file suit on behalf of a client, causing the claim to be barred by limitations.

It is true, of course, that the purpose of disciplinary proceedings is to protect the public rather than to punish the erring attorney. *Attorney Griev. Comm'n v. Kahn,* 290 Md. 654, 431 A.2d 1336 (1981). Marano is wrong, however, in concluding that suspension will not further this purpose, since such a sanction protects the public for the period of the suspension, not only from being further victimized by the attorney's neglect but also by demonstrating the type of misconduct which the Court and legal profession will not tolerate. *Kahn, supra,* 290 Md. at 683, 431 A.2d 1336. *See also Attorney Griev. Comm'n v. Lockhart,* 285 Md. 586, 403 A.2d 1241 (1979); *Attorney Griev. Comm'n v. Montgomery,* 296 Md. 113, 460 A.2d 597 (1983).

█ In view of Marano's gross neglect, a sanction less than suspension cannot be justified in the circumstances of this case. That is the sanction we shall impose in this case. Accordingly, Philip S. Marano shall stand suspended from the practice of law in this State for the period of thirty days beginning thirty days after the filing of this opinion. He shall stand suspended beyond that date unless and until all costs incurred in connection with this proceeding are paid in full.

IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE BV15 c FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST PHILIP S. MARANO.

ELDRIDGE, Judge, concurring:

I concur in the result reached by the majority. *See* my dissenting opinion in *Attorney Griev. Comm'n. v. Sinclair,* 299 Md. 644, 474 A.2d 1338 (1984), also filed today.