In the Matter of JOSE A. REY, Appellant, v PAN AMERICAN CASH & CARRY CORP., Respondent, and RICARDO CAPOTE, Respondent.

Second Department, December 4, 1989

## APPEARANCES OF COUNSEL

*Alter & Alter (Stephanie S. Alter* of counsel), for appellant.

*Shea & Gould (John B. Grant, Jr.,* and *George G. Nelson* of counsel), and *Previte, Farber & Rosen, P. C. (Joseph Farber* of counsel), for respondent. (One brief filed.)

## OPINION OF THE COURT

EIBER, J.

A nonpetitioning shareholder, when confronted with a petition for corporate dissolution premised upon Business Corporation Law § 1104-a, may elect to purchase the shares owned by the party seeking dissolution and thereby preserve the corporate existence *(see,* Business Corporation Law § 1118). The instant appeal raises questions concerning the revocability of an election to exercise the statutory "buy-out" alternative to involuntary dissolution.

The salient facts are substantially uncontroverted. The dispute centers around Pan American Cash & Carry Corp., a domestic corporation which was formed for the purpose of operating a supermarket in Jackson Heights, Queens. Its sole shareholders are Jose Rey and Ricardo Capote. Each party owns 50% of the corporate stock.[1]

The record discloses that the relationship between Rey and Capote, for a variety of reasons, grew increasingly acrimonious. In April 1986 Rey sought to terminate his commitment to the corporation and recover the fair value of his investment by commencing the instant proceeding for judicial dissolution pursuant to Business Corporation Law §§ 1104 and 1104-a. Rey charged in his verified petition that Capote had fraudulently misappropriated corporate funds and that he was guilty of looting, wasting and diverting corporate assets for noncorporate purposes. Rey further averred that he and Capote were unable to agree upon the manner in which corporate affairs were to be conducted and that dissolution was, therefore, warranted on the ground of internal shareholder dissension.

---

1. Although Capote initially alleged that he was the majority shareholder, with 66⅔% of the outstanding shares, he concedes, in his brief, that he and Rey are, in fact, equal shareholders.

Faced with the prospect of forced liquidation, yet convinced that continued corporate operations would yield a profit, Capote elected to exercise his statutory option to purchase Rey's shares. By a formal notice of election pursuant to Business Corporation Law § 1118 dated May 23, 1986, Capote memorialized his intention to buy out Rey's interest.[2]

Business Corporation Law § 1118 (b) provides that in the event the parties are unable to reach an agreement as to the fair value of the shares sought to be purchased by the nonpetitioning party, the court, upon motion, shall stay the dissolution proceeding and determine the fair value of the petitioner's stock. For this purpose, fair value is to be determined as of the day immediately preceding the filing of the petition for dissolution.

Although the record is somewhat vague, it appears that Capote at some point requested a hearing pursuant to Business Corporation Law § 1118 (b) to determine the fair value of Rey's shares. However, on March 2, 1987, before the hearing commenced, and before any dissolution had been ordered, a fire occurred at the corporate premises, which gutted the building and effectively destroyed the business as well as the feasibility of future operations at its location.

The pivotal point in the events underlying this litigation occurred approximately 10 months later, when Capote moved pursuant to Business Corporation Law § 1118 (a) for leave to revoke his election to purchase Rey's shares. Capote argued in his supporting papers that he should be permitted to withdraw his election because the fire and the resulting termination of corporate activities could not have been foreseen. He further alleged that the corporation was heavily in debt, owing in excess of $100,000 to the New York State Department of Taxation and Finance, $200,000 to Citibank and additional sums to various other corporate creditors.[3] Capote claimed that the fire insurance proceeds would cover some, but not all of this debt and that it would be inequitable to

---

2. In his verified answer dated May 27, 1986, Capote denied the allegations that he manipulated and exploited the corporation to Rey's detriment. Capote further alleged, by way of an affirmative defense, that he and Rey had entered into a contract, whereby Rey agreed to transfer his shares in the corporation to Capote for "good and valuable consideration".

3. According to Capote, on June 10, 1987, the corporation's lease on its premises in the Pan American Mall was terminated for nonpayment of rent "as no funds were available to pay rent". He also indicated that there were no other corporate assets to be liquidated.

compel him to purchase Rey's shares at their prepetition value, when the corporation now had a negative net value and was no longer capable of producing any income. Capote's affidavit also alluded to the fact that at the time he exercised the option to purchase Rey's stock interest, there was no legal prohibition against revoking an election. He urged that his motion be granted so that he would not be forced to bear a disproportionate burden of the losses incurred as a result of the fire.

Rey strenuously opposed the motion. His primary complaint was that Capote brought the motion some 20 months after having filed his notice of election. He stated: "The present application was served after the parties appeared in Court on two (2) separate occasions * * * Only at the eve of trial did Mr. Capote see fit to contrive a scenario in an attempt to avoid his election to purchase my shares of stock at their fair market value".

Although Rey did not seriously dispute the fact that the supermarket had been destroyed by fire, he nevertheless argued that any event which occurred subsequent to the filing of the petition for dissolution was immaterial. He suggested, moreover, that since Capote had unilaterally controlled the corporation for a substantial period of time, it would be appropriate to compel him to proceed with the election.

The Supreme Court, after balancing the equities, granted Capote's motion for leave to revoke his election. In so ruling, the court stated:

"Pursuant to BCL 1118 (a) an election to purchase the shares of a shareholder who commences a judicial dissolution proceeding pursuant to BCL 1104-a 'shall be irrevocable unless the court, in its discretion, for just and equitable considerations, determines that such election be revocable'. If the parties are unable to agree upon the fair value of such shares 'the court * * * shall determine the fair value of the petitioner's shares as of the day prior to the date on which such petition was filed exclusive of any element of value arising from such filing'. The legislative purpose for not allowing an election to be revocable without court approval was to ensure that negotiations to determine fair value be conducted expeditiously and in good faith and that the election not be made for strategic purposes (1986 NY Legis Ann, Memorandum of Assemblyman G. Oliver Koppell).

"In the matter herein, it seems clear that respondent Ca-

pote did not make an election to purchase petitioner's shares of stock for any strategic reason. It would be unfair, since the business has been destroyed, to expect said respondent to now buy petitioner's shares at their value the day prior to the date on which the petition for judicial dissolution was filed".

Rey appeals from the order entered on this decision.

Prior to September 1, 1986, Business Corporation Law § 1118 contained no provision limiting the right of a nonpetitioning shareholder to revoke his or her election to purchase the shares held by the party seeking dissolution. Thus, it was possible for a nonpetitioning shareholder to invoke Business Corporation Law § 1118 election rights, engage in negotiations as to the fair value of the petitioner's stock and, if such negotiations proved unavailing, revoke the election and require the petitioner to prove the allegations underlying the petition for dissolution. The petitioner, in the interim, would have been subjected to extended delays, without any recourse against the prospective purchaser.

The absence of statutory guidelines governing the revocability of a Business Corporation Law § 1118 election was criticized by a leading commentator, Professor John Davidian, who noted: "Once made, the election should remain irrevocable so as to avoid any benefit to the majority by virtue of delay tactics. Surely, the majority, now in exclusive control of the business, will seek all avenues of delay in the hope of forcing the petitioner to accept a lesser price for his stock. This potential inequity may be avoided by indicating the irrevocable nature of the election in the statute and by providing that the petitioner, in addition to the prospective purchasers, may apply to the court for a determination of the value of his stock in the event that the parties are unable to agree voluntarily upon such value" (see, Davidian, *Corporate Dissolution in New York: Liberalizing the Rights of Minority Shareholders,* 56 St. John's L Rev 24, 71 [1981]).

The concerns identified by Professor Davidian were echoed by Assemblyman G. Oliver Koppell, sponsor of the bill to amend Business Corporation Law § 1118. He, too, suggested that the use of delay tactics could be eliminated "by making a section 1118 election irrevocable and by allowing a petitioner to also apply to the court for a fair value determination when negotiations break down" (1986 NY Legis Ann, at 349).

The Legislature responded, on August 2, 1986, by approving an amendment to Business Corporation Law § 1118 (L 1986,

ch 861, eff Sept. 1, 1986), which partially incorporated the recommendations cited above. To remedy the problems generated by delays in the negotiation of a fair value for the petitioner's stock, subdivision (a) of the statute now provides: "An election pursuant to this section shall be irrevocable *unless the court, in its discretion, for just and equitable considerations, determines that such election be revocable*" (emphasis supplied).[4]

We begin our analysis of the present controversy by noting that Capote availed himself of the statutory buy-out remedy at a time when such elections were, in the face of legislative silence, freely and unconditionally revocable. Thus, it was reasonable for Capote to proceed with the election on the assumption that he would not be immutably bound by this decision and that he could ultimately revoke the election, especially in the event of an unanticipated and material change in circumstances. It is also fair to conclude that Capote's legitimate expectations with respect to his ability to revoke may have significantly influenced his decision to pursue the statutory purchase option. Seen in this context, an affirmance of the order appealed from would be warranted on the ground that the rights and obligations of the parties were fixed by the statute as it existed at the time of the election *(see, Simonson v International Bank,* 14 NY2d 281; *Shielcrawt v Moffett,* 294 NY 180; *People v Thompson,* 129 AD2d 655), and that revocation was consistent with the law which then prevailed.

However, even if we were to apply the amendment to Business Corporation Law § 1118 (a) retroactively, on the basis of the remedial purposes underlying its enactment *(see,* McKinney's Cons Laws of NY, Book 1, Statutes § 54; *Matter of Asman v Ambach,* 64 NY2d 989; *Becker v Huss Co.,* 43 NY2d 527; *Coffman v Coffman,* 60 AD2d 181), the result would be the same. As indicated previously, the Legislature amended section 1118 as a means of countering delays in the negotiation of a fair value of the stock to be redeemed. Nothing in this record, however, demonstrates that Capote engaged in delay tactics in order to induce Rey to sell his shares at a

---

4. As a further disincentive for delay, subdivision (b) of Business Corporation Law § 1118 was amended to provide that the petitioner, in addition to the prospective purchaser, may apply to the court for a stay of the dissolution proceeding and a determination as to the fair value of his shares. The court, in its discretion, may also award the petitioner interest from the date the petition is filed to the date of payment for the petitioner's shares.

depressed price or that Capote failed to act in good faith in the negotiation of a price determination for Rey's shares. Moreover, it appears that Capote requested that the court intervene and conduct a hearing to determine fair value in accordance with Business Corporation Law § 1118 (b).[5] Although Rey, in his opposition papers, alluded to the fact that there were two adjournments of the fair-value hearing, the record is barren of information as to when and why the adjournments were sought. We do not know, for instance, whether Rey affirmatively pressed for a timely hearing, whether he vigorously opposed the requests to adjourn or, for that matter, whether he consented to the adjournments. Accordingly, it would be unfair, in the absence of such information, to hold Capote legally accountable for the delay occasioned by the adjournments.[6] In any event, Rey's reliance upon the adjournments to support his contention that Capote should not be permitted to revoke his election, ignores the fact that the granting of adjournments is innately within the discretion of the court (see, Matter of Patricia L. v Steven L., 119 AD2d 221; Spodek v Lasser Stables, 89 AD2d 892; Matter of Case, 24 AD2d 797).

Rey further argues, and not without some facial justification, that it would be inequitable to allow Capote to revoke his election since he unilaterally controlled the corporation during the pendency of this proceeding and for a period of time prior thereto. The flaw in this argument, however, lies in the fact that Rey is a 50% shareholder and, as such, had a right to exert control over the corporation and to set parameters with respect to the manner in which the business affairs would be conducted. Rey, instead, failed to assume the responsibilities of corporate management and, therefore, should not

**5.** We take this opportunity to note that due to the paucity of information in the record, we are unable to discern the circumstances which precipitated the request for a judicial determination of fair value. It is also unclear when this request was made. However, even if we were to assume, for the sake of argument, that Capote did not expeditiously request a fair-value hearing, the fact remains that Rey could have applied to the court for such relief as of September 1, 1986, which was six months before the fire.

**6.** With respect to postfire delay, we acknowledge that while Capote inexplicably waited until 10 months after the fire to apply for permission to revoke, it is clear that the operative event which caused the reduction in the corporation's share value was the fire. Since the fire virtually obliterated the business and since there was little danger of Capote "exploiting" the corporation following the fire, any prejudice to Rey as a result of the postfire delay may be viewed as minimal.

be heard to complain about the ramifications of his decision or his inaction.[7]

Perhaps most importantly, Business Corporation Law § 1118 (a), in its present form, conditionally authorizes the revocation of a buy-out election where the court, in its discretion, for "just and equitable considerations" determines that such relief is appropriate. We are convinced that an unforeseeable fire, which impairs, if not destroys, the value of corporate stock, constitutes a "just and equitable consideration", within the purview of the statute. Under the circumstances, it would be unreasonable to expect Capote to purchase Rey's shares at their prepetition value, when the stock has been rendered worthless because of an unfortunate and unanticipated event. Rather, the parties, as equal shareholders, should proportionately bear the financial losses occasioned by the fire. *Matter of Fontana D'Oro Foods* (65 NY2d 886), upon which Rey heavily relies, does not compel a contrary result. That case involved the enforceability of a private stipulation regarding the transfer of stock and not a statutory election which is subject to revocation upon leave of the court.

In conclusion, since the Supreme Court did not improvidently exercise statutory discretion in permitting the revocation, the order appealed from is affirmed, with costs to the respondent-respondent.

KUNZEMAN, J. P., RUBIN and ROSENBLATT, JJ., concur.

Ordered that the order is affirmed, with costs to the respondent-respondent.

---

7. It is significant, in this regard, to note that the Business Corporation Law does provide remedies to shareholders who reasonably perceive that the corporation is being operated for the personal benefit of those in control while the proceeding for dissolution is pending *(see, e.g.,* Business Corporation Law §§ 1113, 1202; *see also, Greer v Greer,* 124 AD2d 707; *Matter of Ronan Paint Corp.,* 98 AD2d 413; *Matter of Delinko,* 85 AD2d 561). Again, there is no indication in the record that Rey took any steps to protect his interest, despite the availability of these remedies *(see generally,* 15 NY Jur 2d, Business Relationships, §§ 1184-1185).