704 A.2d 448

**Gregory M. PAPILLO**

v.

**POCKETS, INC. et al.**

**No. 230, Sept. Term, 1997.**

Court of Special Appeals of Maryland.

Nov. 5, 1997.

Shelton H. Skolnick (Skolnick & Leishman, P.C., on the brief), Derwood, for Appellant.

Clyde H. Sorrell, Bethesda (Albert E. Crandall, Gaithersburg, on the brief), for Appellees.

Argued before CATHELL and HOLLANDER, JJ., and ROBERT SWEENEY, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

Gregory M. Papillo, appellant, and Albert E. Crandall, appellee, have been engaged in a protracted dispute concerning two close corporations in which each party owned a fifty percent interest. In 1993, after appellant sought dissolution of both corporations, appellee elected to avoid dissolution by purchasing appellant's stock, pursuant to Md.Code (1975, 1993 Repl.Vol.), § 4–603 of the Corporations and Associations Article ("C.A."). Several years later, the trial court essentially determined that appellee's election was revocable at will. Thereafter, appellant noted his appeal and presents two questions for our review, which we have rephrased:

I.   Is the statutory election to avoid dissolution of a close corporation, exercised pursuant to § 4–603 of the Corporations and Associations Article, revocable at will?

II.  Did the trial court err or abuse its discretion in permitting appellee to revoke in 1996 the election to purchase appellant's stock that he exercised in 1993?

As we shall answer the first question in the negative, we must remand the matter for further proceedings.

### Factual Background

The salient facts are substantially undisputed. In 1992, appellant and appellee each invested approximately $50,000.00 to form and operate a billiards parlor business through two close corporations, Pockets, Inc. ("Pockets") and Pima, Inc.

("Pima"). Pockets operated the billiards parlor, and Pima owned the equipment, which it leased to Pockets. The parties were the sole stockholders of the corporations, with each party owning fifty percent of the stock of each corporation.

In early 1993, for reasons not relevant here, the relationship between the parties grew acrimonious. As a result, on July 2, 1993, appellant filed a complaint in the Circuit Court for Montgomery County to dissolve both corporations. Faced with involuntary dissolution, appellee intervened and elected to exercise his statutory right to purchase appellant's stock, pursuant to C.A. § 4–603. The court (Miller, J.) issued an order on November 16, 1993, permitting appellee to stay dissolution proceedings so long as appellee timely posted a $60,000.00 bond.

In order to satisfy the statutory requirement to purchase the stock at its fair market value as of the time of filing of the petition for dissolution, appellee sought an appraisal of appellant's stock. By order of April 28, 1994, the court appointed three appraisers. In an order filed September 28, 1994, the court (Ruben, J.), determined that, at the relevant time, and based on the appraisers' reports, the value of appellant's stock in the two corporations was $16,291.00. After appellee paid $16,291.00 to appellant, the bond was released, pursuant to an order of court stating it was to be released "regardless of the pendency of any appeal." Subsequently, appellant noted his appeal to this Court, in order to challenge the amount of the valuation. In a *per curiam* opinion, we affirmed in part and reversed in part, and remanded the case to the trial court to "conduct a hearing at which each party may present testimonial or tangible evidence in support of or in opposition to the appraisers' report." *Papillo v. Pockets Inc.*, No. 416, Sept. Term 1995, slip op. at 11, 107 Md.App. 748 (filed December 8, 1995).

On remand, the trial court conducted an evidentiary hearing as to valuation. Thereafter, it rejected all of the appraisers' reports, and stated that it considered that the parties were back to "square one." By order filed August 2, 1996, the court

(Donohue, J.) ordered new appraisals "subject to Motions of the parties regarding election to purchase the stock." Before appointment of the new appraisers, however, appellee sought to revoke his election to purchase appellant's stock and moved to proceed with dissolution. He claimed that, as a result of the delay caused by the lengthy proceedings, he lacked the financial resources to consummate the election to purchase.

On November 27, 1996, the court conducted a hearing concerning appellee's motion. In an opinion and order filed December 4, 1996, the court (McGuckian, J.) granted appellee's motion to proceed with dissolution, stating:

> *The Court finds that there is nothing in* [C.A. § 4–603] *which would preclude a stockholder from withdrawing his petition to avoid dissolution at any time. It would be contrary to the clear purpose of Section 4–603 to preclude such a move by a stockholder* since such action would cause the corporation to be at a standstill, which is clearly what this section is meant to avoid. *The section does not contemplate personal judgments against a stockholder for failing to complete a petition under this section.* The right of the plaintiff to recover any funds that may have unwarrantedly gone to the benefit of the defendant during the pendency of this litigation can be handled through the provisions for dissolution set forth in Title 3 of [the Corporations and Associations] Article.

(Emphasis added). It is this ruling that is at issue here.

## Discussion

### A.

Appellant contends that an election to purchase stock pursuant to C.A. § 4–603 is irrevocable. The statutory provision is silent, however, as to the ability to revoke an election. Section 4–603 provides, in pertinent part:

> (a) *Stockholder's right to avoid dissolution.*—Any one or more stockholders who desire to continue the business of a close corporation may avoid the dissolution of the corpora-

tion ... by electing to purchase the stock owned by the petitioner at a price equal to its fair value.

(b) *Court to determine fair value of stock.* (1)—If a stockholder who makes the election is unable to reach an agreement with the petitioner as to the fair value of the stock, then, if the electing stockholder gives bond or other security sufficient to assure payment to the petitioner of the fair value of the stock, the court shall stay the proceeding and determine the fair value of the stock.

It is immediately apparent that the statute does not speak to whether, or under what circumstances, an electing stockholder may change his or her mind and revoke an election to purchase the petitioner's stock. Given that "[t]he statute is silent on the question ... it is into this breach that the Court must step with a reasonable interpretation." *D & Y, Inc. v. Winston,* 320 Md. 534, 539, 578 A.2d 1177 (1990) (construing Md.Code (1974, 1988 Repl.Vol.), § 10–102(f) of the Real Property Article). As we have not discovered any Maryland case construing the provision in issue, we begin with a brief review of the guiding principles of statutory construction.

The interpretation of a statute presents a question of law. *Hider v. Department of Labor, Licensing and Regulation,* 115 Md.App. 258, 273, (1997), *rev'd on other grounds,* —— Md. ——, —— A.2d ——, 1998 WL 107991, No. 63, Sept. Term 1997 (filed March 13, 1998); *Mayor of Ocean City v. Purnell–Jarvis, Ltd.,* 86 Md.App. 390, 413, 586 A.2d 816 (1991). The seminal rule of statutory construction requires that we determine and effect the intent of the Legislature. *Oaks v. Connors,* 339 Md. 24, 35, 660 A.2d 423 (1995); *Mayor of Baltimore v. Cassidy,* 338 Md. 88, 93, 656 A.2d 757 (1995); *Privette v. State,* 320 Md. 738, 744, 580 A.2d 188 (1990). To accomplish this task, we ordinarily look to the language in the statute itself. *Allied Vending Inc. v. City of Bowie,* 332 Md. 279, 306, 631 A.2d 77 (1993); *State v. Patrick A.,* 312 Md. 482, 487, 540 A.2d 810 (1988); *Jones v. State,* 311 Md. 398, 405, 535 A.2d 471 (1988). "[T]he Court considers the language of an enactment and gives that language its natural and ordinary meaning."

*Montgomery County v. Buckman,* 333 Md. 516, 523, 636 A.2d 448 (1994). As the Court said in *Harris v. State,* 331 Md. 137, 626 A.2d 946 (1993), "Giving the words their ordinary and common meaning 'in light of the full context in which they appear, and in light of external manifestations of intent or general purpose available through other evidence,' normally will result in the discovery of the Legislature's intent." *Id.* at 146, 626 A.2d 946 (citations omitted). Moreover, "we seek to avoid constructions that are illogical, unreasonable, or inconsistent with common sense." *Frost v. State,* 336 Md. 125, 137, 647 A.2d 106 (1994); *see also Fraternal Order of Police, Montgomery County Lodge No. 35 v. Mehrling,* 343 Md. 155, 174, 680 A.2d 1052 (1996); *Condon v. State,* 332 Md. 481, 492, 632 A.2d 753 (1993).

We also consider the statute's purpose, *Blaine v. Blaine,* 336 Md. 49, 69, 646 A.2d 413 (1994); *Kaczorowski v. Mayor of Baltimore,* 309 Md. 505, 513, 525 A.2d 628 (1987), and the context in which it was adopted. *C.S. v. Prince George's County Dept. of Soc. Servs.,* 343 Md. 14, 24, 680 A.2d 470 (1996); *Condon,* 332 Md. at 491, 632 A.2d 753; *Motor Vehicle Admin. v. Mohler,* 318 Md. 219, 225, 567 A.2d 929 (1990); *Brzowski v. Maryland Home Improvement Comm'n,* 114 Md.App. 615, 627, 691 A.2d 699, *cert. denied,* 346 Md. 238, 695 A.2d 1227 (1997). Thus, we do not read a statutory provision in isolation. Instead, we consider the purpose, goal, or context of the statute as a whole. *Prince George's County v. Vieira,* 340 Md. 651, 658, 667 A.2d 898 (1995); *Board of Trustees v. Hughes,* 340 Md. 1, 7, 664 A.2d 1250 (1995); *Frost,* 336 Md. at 138, 647 A.2d 106.

Often, it is necessary for us to examine the development of the statute to discern the Legislature's intent. *C.S.,* 343 Md. at 24, 680 A.2d 470; *Condon,* 332 Md. at 492, 632 A.2d 753; *Mohler,* 318 Md. at 225, 567 A.2d 929. The legislative history concerning C.A. § 4–603 is useful here.

The close corporation statute was enacted in 1967. 1967 Md. Laws, Ch. 649 § 14; *see* Md.Code (1957, 1967 Repl.Vol., 1967 Cum. Supp.), Art. 23 §§ 100–111 (now codified, as

amended, at C.A. §§ 4–101 to 4–603).[1] It was adopted substantially as proposed in the *Final Report of the Commission on Revision of the Corporation Laws of Maryland* (the "Report"), dated December 15, 1966. Of particular interest here, as to the ability to avoid dissolution by purchasing a petitioner's stock, the Report stated:

> [F]or all judicial dissolutions of close corporations stockholders other than the party moving for dissolution may, in appropriate cases and *subject to the discretion of the court*, avoid dissolution by purchasing the shares of the petitioner at a fair appraised value, except where there is a contrary stockholders' agreement with respect to a dissolution proceeding. . . .

*Id.* at 75 (emphasis added). Moreover, the official comment to the then-newly enacted statute included the precise language that we just quoted from the Report. *See* Md.Code (1957, 1967 Repl.Vol., 1967 Cum.Supp.), Art. 23 § 100 cmt.

A member of the Commission on Revision of the Corporation Laws of Maryland subsequently described the purpose of

---

1. The original version of the buy-back provision did not address the right to revoke. It stated, in pertinent part:

   *Avoidance of dissolution by purchase of petitioner's stock.*—Any one or more stockholders desiring to continue the business of a close corporation may avoid the dissolution of the corporation or the appointment of a receiver under this section or under § 79A of this article by electing to purchase the shares of stock owned by the petitioner at a price equal to their fair value. If stockholders' making such election are unable to reach an agreement with the petitioner as to the fair value of his shares, the court shall, upon the stockholders' giving bond or other security sufficient to assure to the petitioner payment of the value of his shares, stay the proceeding and proceed to determine the value of the shares, in accordance with the procedure set forth in § 73(f) of this article, as of the close of business on the day on which the petition for dissolution was filed.

   \* \* \*

   Upon full payment of the purchase price, under the terms and conditions specified by the court, or at such other time as may be ordered by the court, the petitioner shall transfer the shares of stock to the purchasing stockholder.

   Md. Code (1957, 1967 Repl. Vol., 1967 Cum. Supp.) Art. 23 § 109(c) (codified as amended at C.A. § 4–603).

the buyout provision in a law review article. Although he did not address the issue presented here, the author explained:

It results in a fair accommodation of the conflicting interests involved, on the one hand the desire to continue a profitable enterprise, and on the other, *a desire to secure reasonable value for one's ownership interest.*

\* \* \* \*

Stockholders asserting their right to bar dissolution by the purchase of the stock of a stockholder petitioning for dissolution are required to give bond or sufficient security to insure their ability to pay a reasonable price for the stock. *This serves both as a protection to the stockholder seeking dissolution and as a deterrent to harassing or delaying tactics.*

There is a danger that stockholders who in fact wish to continue to operate the business might permit dissolution and liquidation of the company in order to buy the assets at a lower figure than it would be necessary for them to pay if they elected to purchase the stock of the shareholder seeking dissolution. Since this would circumvent *the statute's purpose of providing the stockholder a reasonable alternative when transfer of his stock is barred,* it is to be hoped that the courts will not approve liquidation sales to other stockholders over the objection of the liquidating stockholder when such sales make it possible for the remaining stockholders to continue the business.

William G. Hall, *The New Maryland Close Corporation Law,* 27 Md. L. Rev. 341, 362 (1967) (emphasis added).

Although the close corporation statute was recodified in 1975, no substantive changes were enacted with respect to the statutory election provision. *See* Md.Code (1975), C.A. § 4–603 (Revisor's Note); *see also Allers v. Tittsworth,* 269 Md. 677, 683, 309 A.2d 476 (1973) ("The practice of considering revision commission reports in searching for legislative intent is too well established to be open to question."); *Abington Ctr. Assocs. v. Baltimore County,* 115 Md.App. 580, 599, 694 A.2d

165 (1997) (noting that revisor's construction is relevant with regard to determination of legislative intent). Thus, Maryland's statute has remained essentially unchanged since its enactment thirty years ago; it is completely silent with respect to the right to revoke. Considering the purpose of C.A. § 4–603, however, we are of the view that the Maryland Legislature did not intend to bar revocation altogether. Neither can we discern any intention by the Legislature to permit unfettered revocation of an election to purchase a petitioner's stock.

Although we have not found any reported Maryland case that addresses the precise question presented here, numerous other states with buy-back statutes have considered the matter.[2] In our survey of the law of other states, it is apparent that many have statutory buyout provisions that expressly disfavor revocability. Nevertheless, these statutes continue to reserve for the court some degree of discretion. *See, e.g.,* Ala.Code § 10–2B–14.34(a) (Michie 1994) ("An election pursuant to this section shall be irrevocable *unless the court determines that it is equitable to set aside or modify the election."* (emphasis added)); Conn. Gen.Stat. § 33–900(a) (1997) (same); Fla. Stat. Ann. § 607.1436(1) (West Supp. 1997) (same); Miss. Code Ann. § 79–4–14.34(a) (1996) (same); N.H.Rev. Stat. Ann. § 293–A:14.34 (Supp.1994) (same); Utah Code Ann. § 16–10a–1434(1) (1995) (same); *see also, e.g.,* N.Y. Bus. Corp. Law § 1118(a) (McKinney Supp. 1996) ("An election pursuant to this section shall be irrevocable *unless the court, in its discretion, for just and equitable considerations, determines that such election be revocable."* (emphasis added)).

Like Maryland, other states have buy-back provisions that omit any reference to the ability to revoke. Yet judicial construction of these statutes has made plain that the trial courts are deemed to have discretion with respect to revocation of an election to purchase a petitioner's stock. *See, e.g.,* Mo. Ann. Stat. § 351.860.3 (West 1991) ("After the purchase

---

**2.** To our surprise, in their briefs submitted to this Court, neither party cited a single case for any purpose.

order is entered, any party may petition the court to modify the terms of the purchase and the court may do so if it finds that changes in the financial or legal ability of the corporation or other purchaser to complete the purchase justify a modification."); Mont. Code. Ann. § 35–9–503(3) (1995) (same); Wyo. Stat. Ann. § 17–17–142(c) (Michie 1997) (same).

We are especially guided by the view of the court in *Bogosian v. Woloohojian*, 749 F.Supp. 396, 401 (D.R.I. 1990). It considered the issue of the ability to revoke an election when the applicable buy-back statute was silent. The court declined to implement a bright line rule, opting instead to consider the equities of the particular case. *See also Brodsky v. Seaboard Realty Co.*, 206 Cal.App.2d 504, 24 Cal.Rptr. 61, 69 (1962) (holding, under then-existing version of buyout statute, that the ability to revoke an election to purchase petitioner's shares was within the discretion of the trial court); *cf. Rey v. Pan Am. Cash & Carry Corp.*, 152 A.D.2d 246, 548 N.Y.S.2d 524, 527, 529 (1989) (holding that it would be unreasonable to prevent revocation because stock would be rendered worthless by intervening fire that destroyed the corporate premises, but indicating in dicta that under prior version of statute, which was silent on the ability to revoke, it was possible that electing stockholder could freely revoke election to purchase); *see generally* 16A Timothy P. Bjur & James Solheim, *Fletcher Cyclopedia of the Law of Private Corporations* § 8043, at 100 & n. 5 (Perm. ed. 1995) ("Whether an election to buy-out a dissident shareholder is revocable depends on the jurisdiction." (citing *Bogosian* and *Rey*)).

In *Bogosian*, the court reviewed Rhode Island's buyout statute, which closely resembles Maryland's precursor to C.A. § 4–603. Rejecting unilateral revocation, at will, the *Bogosian* court reasoned:

A strong and probably successful argument can be mounted that the Rhode Island General Assembly did not authorize revocation at will of the election to purchase plaintiff's stock. The purpose of the statute, to bring peace to the troubled waters soiled by stockholder dissent, would result in a

fragile peace if the corporation could simply withdraw its election on a whim.

This construction of the statute [allowing unfettered right to revoke] would provide [the electing stockholder] a potent weapon to temporarily silence an opposing stockholder, since during the interregnum between the filing of an election and its later withdrawal, the opposing stockholder is effectively denied all rights qua stockholder.... [F]ollowing the purported withdrawal of the election, [the electing stockholder] must acknowledge that the plaintiff's rights as a stockholder are revived, without any real remedy, however, for the denial of [the plaintiff's] rights as a stockholder while the [electing stockholder] persisted in its election. It should not be expected that the General Assembly ... intended to vest such capricious power in [an electing stockholder] or that it intended to deny an opposing shareholder her rights so completely and without a remedy. Of course, the statute must be construed to avoid such an absurd result.

*Bogosian*, 749 F.Supp. at 399.

The court also distinguished *Rey*, by noting the "remarkable" differences between the Rhode Island statute and an earlier version of the New York statute:

New York Business Corporation Law § 1118 did not provide for a bond to be posted after election. More importantly, neither ... [did it] provide[ ] for immediate termination of the non-electing stockholder's rights, or for payment of interest after the election. The Rhode Island statute, however, does contain these provisions.

*Bogosian*, 749 F.Supp. at 399.

C.A. § 4–603 contains provisions similar to the Rhode Island statute and is equally distinguishable from *Rey*. As we see it, interpreting Maryland's statute to permit the unbridled, unilateral right to revoke a buyout election would, in some circumstances, thwart the Legislature's goal of protecting minority stockholders of close corporations. On the other hand, if we were to construe the statute to bar revocation,

regardless of the circumstances, that, too, would lead to unreasonable and inequitable results. *See, e.g., Rey,* 548 N.Y.S.2d at 529 ("Under the circumstances, it would be unreasonable to expect [the electing stockholder] to purchase [the petitioning stockholder's] shares at their prepetition value, when the stock has been rendered worthless because of an unfortunate and unanticipated event.").

■ We observe that those states providing a statutory right to purchase a petitioner's stock in order to avoid dissolution have found a common thread with regard to the right to revoke the election: judicial discretion. In some states, as we noted, judicial discretion is expressly authorized in the text of the statute. In the two states that have directly addressed the issue in the face of legislative silence, the courts have concluded that the statutes permit judicial discretion. Our analysis of C.A. § 4–603 leads us to the ineluctable conclusion that the Maryland Legislature intended no less. Accordingly, we hold that the revocation of an election to purchase a petitioner's stock, pursuant to C.A. § 4–603, is subject to the sound discretion of the trial court.

In this case, the trial court essentially determined that appellee was unilaterally entitled to revoke his election at will. Although this may be a case for which revocation is warranted, we conclude that the court erred in deciding, as a matter of law, that an electing stockholder is freely entitled to revoke an election to purchase a petitioner's stock, regardless of the circumstances.

■ In light of our determination, we shall vacate the circuit court's order and remand this matter to the trial court to determine whether, under the circumstances attendant here, revocation is justified. In exercising its discretion, the trial court should consider that at least one purpose of the statutory scheme is to provide the petitioning stockholder with "reasonable value for one's ownership interest." Hall, *supra,* at 362. The trial court should also consider the following factors, among others: (1) whether there will be "remarkable differences ... between fair value [of appellant's stock] at the

time of election and liquidating value," *Bogosian*, 749 F.Supp. at 400; (2) whether any decline in the value of the corporation or its assets is due to any "unanticipated event," *Rey*, 548 N.Y.S.2d at 529; (3) whether appellant "has been excluded from participating in the corporation as a shareholder" between the time of election and revocation, *Bogosian*, 749 F.Supp. at 400; (4) whether, subsequent to releasing the bond, the parties engaged in any "harassing or delaying tactics," *Hall*, *supra*, at 362; and (5) other equitable considerations. If the court determines that revocation is not appropriate, then it should proceed to resolve the issue regarding valuation.[3]

## B.

For the benefit of the court on remand, we shall briefly consider some of the parties' remaining contentions.

Appellant argues that it would be inequitable to permit appellee to change his mind and withdraw his election, thereby forcing appellant to accept dissolution. He contends that he was excluded from the business for thirty-four months—the period from the date that appellee posted the bond for appellant's shares to the date the trial court granted appellee's motion to proceed with dissolution. Moreover, in the interim, he claims that the business has become worthless. Appellant asserts:

> When [appellant] commenced this litigation in July 1993, Pockets, Inc. was an operating business.... By December 26, 1996, Pockets was no longer an operating business and it owed the landlord $96,027.18 for unpaid rent, CAM [sic] and taxes for the premises that it had occupied....

---

**3.** We recognize that the court may determine that revocation is warranted. On the other hand, if it decides against revocation, it must then decide whether the fair market value of appellant's stock exceeded the original appraisal of $16,291.00. We note that appellant has already been paid that sum. The parties have not raised, and therefore we do not consider, whether appellant's acceptance of the $16,291.00 constitutes a wavier of his right to pursue a greater recovery from appellee for appellant's stock.

On or about January 15, 1997, Pima's pool tables were sold for $6000.00. Thus, it appears that the assets of Pockets and Pima are insufficient to pay any money to [appellant], since the amount owed to the landlord exceeds the total assets of Pockets and Pima.

When the court rejected appellant's arguments, it did not appear to consider how appellant would be able to recover the fair value of his stock at the time he filed for dissolution, given that appellee is apparently unable to pay and the corporation is now valueless. Yet we read C.A. § 4-603 as providing the court with discretion to "secure reasonable value" for appellant's ownership interests, Hall, *supra*, at 362, and "[i]t is clear that there are remarkable differences to be expected between fair value at the time of election and liquidating value." *Bogosian*, 749 F.Supp. at 400. On remand, the court should consider, *inter alia*, the length and reasons for the delay, and the reasons for the decline, if any, in the value of Pima and Pockets.

At oral argument, appellee contended, in part, that revocation was properly permitted because, after he gave appellant $16,291.00 for his stock, as required by the trial court's order of September 28, 1994, appellant did not turn over his shares to appellee. Appellee thus asserts that, as a result of appellant's failure to do so, appellant was never divested of his authority to exercise his rights as a stockholder. Therefore, appellee claims that he should not be penalized, because it was appellant who slept on his rights as a stockholder.

Appellee's argument is without merit. Section 4-603(d)(2) expressly states that the petitioner for dissolution "[c]eases to have any other rights with respect to the stock, except the right to receive payment of its fair value." Nowhere in the present version of the statute does it say that the petitioner's rights continue until the stock is physically transferred to the electing stockholder.

We recognize that the trial court was troubled because the bond had been released prior to appellee's revocation. In-

deed, appellee argued to this Court that, because the bond had been released, he should not be required to post another bond, especially when he cannot afford to do so. We point out, however, that the statute does not speak only of posting a bond. It includes "other security sufficient to assure payment to the petitioner." C.A. § 4–603(b)(1). As the trial judge has the power to require the posting of a bond or other security, we see no reason why the $16,291.00 now in appellant's possession could not constitute such "other security."

ORDER VACATED. CASE REMANDED TO THE CIRCUIT COURT FOR MONTGOMERY COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION.

COSTS TO BE PAID BY APPELLEE CRANDALL.