787 A.2d 840

**Richard K. GREEN**

v.

**Larry TAYLOR et ux.**

**No. 1990, Sept.Term, 2000.**

Court of Special Appeals of Maryland.

Dec. 31, 2001.

46

Michael A. Taylor, Rockville, for appellant.

Paul E. Rosenberg, Camp Springs, for appellees.

Argued before KENNEY, DEBORAH S. EYLER and ADKINS, JJ.

ADKINS, Judge.

This case involves a longstanding lending relationship gone sour. In addition to reviewing the trial court's finding that the borrower did not default under any loan, it requires that we interpret the scope of Md. Code (1974, 1996 Repl. Vol.), section 7–106(e) of the Real Property Article ("RP"). This subsection provides for the award of attorney's fees to certain persons who sue to force a real estate lienholder to release the collateral upon payment of the underlying debt. We hold that Section 7–106(e) only applies to actions brought by settlement attorneys or other agents responsible for the disbursement of funds in connection with the grant of title to real property.

Larry and Karen Taylor, appellees, entered into a series of secured loan agreements with John Fernstrom, a private lender, beginning in 1992. When the parties' relationship deteriorated, Fernstrom assigned the right to payment on two deeds of trust to Richard K. Green, a licensed attorney, appellant. Believing that they had fully satisfied the debt underlying these two deeds of trust, the Taylors filed a complaint against Green in the Circuit Court for Prince George's County, requesting the court to compel release of the deeds. After an evidentiary hearing, the trial court found in favor of the Taylors, ordered Green to release the deeds of trust, and awarded attorney's fees to the Taylors pursuant to RP section 7–106(e).

We address the following issues raised by Green:

I. Did the trial court err in holding that a borrower may take direct action to obtain a release of deeds of trust and an award of attorney's fees pursuant to RP section 7–106 when no settlement attorney or agent is involved?

II. Did the trial court err in determining that there was no default under the $65,000 promissory note?

III. Did the trial court abuse its discretion by refusing to make separate and independent findings of fact and conclusions of law, relying instead on appellees' trial memorandum and incorporating that memorandum verbatim?

IV. Did the trial court err in granting appellees' motion to amend the judgment without convening a hearing?

We answer yes to issues I and IV, and no to issues II and III.

## FACTS AND LEGAL PROCEEDINGS

In 1992, the Taylors, looking for a new source of financing, requested Fernstrom to purchase two secured notes representing indebtedness by the Taylors to other lenders. Pursuant to this request, Fernstrom purchased a $67,500 deed of trust note from Rubinstein and Siegel (the "Rubinstein Note") and a $200,000 deed of trust note from Citizens Bank (the

"Citizens Bank Note"). The purchase of these notes was effectuated by assignments from these lenders to Fernstrom.[1]

While the Rubinstein Note and the Citizens Bank Note were still outstanding, Fernstrom loaned money to the Taylors on three subsequent occasions. These loan agreements were documented on standard form commercial promissory notes signed by both of the Taylors on the following dates and for the following amounts: $11,500 on June 11, 1995; $13,500 on June 24, 1996; and $65,000 on April 13, 1997. The April 13, 1997 $65,000 note (the "$65,000 Note") is at the center of the controversy in this case.

The Taylors paid off the Rubinstein Note in August 1998, and the Citizens Bank Note in late December 1998. Fernstrom, however, did not release either of those deeds of trust. The Taylors continued to make payments on the three remaining loans from Fernstrom. According to the Taylors, they were pre-paying each month's interest on the $65,000 Note, and paying "interest only ... until [Mr. Taylor] made the $65,000 payment ... on [February 1, 1999]."

In late November 1998, Fernstrom and the Taylors negotiated a $200,000 loan agreement in the form of a revolving line of credit secured by a deed of trust. The purpose of this loan was to enable the Taylors to buy a house. The loan would also replace the outstanding balances on the smaller loans directly from Fernstrom, which would become part of the total $200,000 indebtedness. Fernstrom directed Green to prepare the paperwork for this loan. Green was Fernstrom's attorney, but also had represented the Taylors in the past in an unrelated matter.

The evidence was disputed as to whether Fernstrom or the Taylors agreed to be responsible for compensating Green for his services. Mr. Taylor testified that, although Fernstrom told him to go to Green's office, he understood Green to be

---

1. The trial court failed to include the August 19, 1992 Modification Agreement regarding the Citizens Bank Note in its original order. Appellees successfully moved to amend the judgment to recognize this assignment in the order.

preparing the loan documents for Fernstrom. He also related that Green never discussed payment of legal fees with the Taylors until after the documents were prepared and signed. Mrs. Taylor testified similarly.

In contrast, Fernstrom testified that he "explained to [Mr. Taylor] that the cost of documenting this new relationship and any legal fees or recordation costs that might be necessitated by creating this new relationship would have to be borne by [Taylor] up front." According to Fernstrom, Taylor responded, "no problem." The trial court resolved this dispute by finding that Fernstrom was responsible for the legal fees associated with drafting the $200,000 loan agreement.

After the Taylors signed the 1998 $200,000 note, they were presented with a bill from Green for the costs of preparing the transaction, including attorney's fees and recording costs. This bill amounted to $5,000.[2] The Taylors refused to pay this amount, and left Green's office without receiving the agreed-upon advance.

On January 23, 1999, Fernstrom declared all of the loans in default. He subsequently assigned all of the loans to Green for consideration, via undated assignments handwritten on the notes themselves. Green testified that this assignment occurred after Fernstrom had declared the notes in default.

According to Mr. Taylor, on February 1, 1999 he "hand-delivered" to Fernstrom a check in the amount the Taylors understood to be the remaining balance due on the $65,000 Note. Green and Fernstrom, however, suggested that Taylor did not deliver this check until February 2, 1999. Although Fernstrom informed Taylor that the $65,000 Note already had been assigned to Green, Fernstrom accepted the Taylors' check, and forwarded it to Green. Taylor testified that he thought this check fully paid off the $65,000 Note. According to Green, however, Taylor did not pay interest for the month

---

2. Of this amount, $2,500 was for actual attorney's fees, and $2,500 was for anticipated recording costs.

of January or the first two days of February 1999, so the $65,000 Note was not paid in full.

The Taylors, asserting that both the Citizens Bank and Rubinstein Notes had been fully paid off, asked both Fernstrom and Green to release the deeds of trust securing these loans. They refused. On March 29, 1999, the Taylors filed this action against Fernstrom and Green in the Circuit Court for Prince George's County,[3] seeking to compel release of those deeds of trust. In addition, the Taylors sought attorney's fees for the expenses of obtaining these releases.

At trial, the Taylors disputed the validity of Fernstrom's January 1999 declaration of default, claiming that Fernstrom's sole reason for doing so was the Taylors' failure to pay Green's $2,500 attorney's fees bill stemming from the November 27, 1998 transaction. Fernstrom's testimony at trial revealed the following:

[Taylors' Counsel]. Okay. Now, can you articulate what the default was on the 23rd of January?

[Fernstrom]. Yes.

Q. He didn't owe any interest or anything at that point?

A. No, but he owed monies that had been incurred by the lender on his behalf that he had refused to pay.

Q. So the default then would have been the $2,500?

A. In essence, yes.

Q. And there was no other reason to default, for there to be a default?

A. I think there was one other reason for a default, but I can't recall it right now.

---

3. Both Green and Fernstrom filed counterclaims against the Taylors. Fernstrom's counterclaim was later dismissed prior to the commencement of trial, pursuant to a settlement agreement. Under this settlement agreement, the Taylors agreed to drop their claim against Fernstrom if Fernstrom would agree to drop his counterclaim. Both suits were dismissed with prejudice. Thus, only the Taylors' claim against Green and Green's counterclaim against the Taylors, seeking payment of monies due under the notes assigned to him by Fernstrom, were actually litigated.

In a written opinion and order, the trial court ruled in favor of the Taylors. Finding the Taylors' testimony that they never agreed to pay Green's fees for the November 1998 transaction "fully credible," the court concluded that there never was a default on the $65,000 Note or the other loans. The court's order expressly incorporated the "findings of fact and conclusions of law [in] Plaintiff's [Trial] Memorandum as if fully [set forth] [t]herein." The court further declared that the two deeds of trust were "paid in full," appointed a trustee to "discharge and release said Deeds," and awarded attorney's fees to the Taylors in the amount of $9,998.00. An amended order was entered on September 13, 2000, in response to the Taylors' motion to amend the judgment. *See infra* n. 1.

We will recount further facts below as they relate to the specific issues raised by Green.

## DISCUSSION

### I.

### The Trial Court Erred In Holding That Section 7–106(e) Authorizes The Award Of Attorney's Fees Under The Circumstances Of This Case

Green first challenges the award of attorney's fees to the Taylors, contending that they have no standing to bring an action for fees under RP section 7–106(e). Subsections (d) and (e) of section 7–106 provide:

(d) *Furnishing original copy of executed release.*—Any person who has a lien on real property in this State ... shall furnish to the person responsible for the disbursement of funds in connection with the grant of title to that property the original copy of the executed release of that lien....

(e) *Enforcement.*—If the holder of a lien on real property or his agent fails to provide the release within 30 days, **the person responsible for the disbursement of funds in connection with the grant of title to the property,** after having made demand therefor, **may bring an action to enforce the provisions of this section** in the circuit court

for the county in which the property is located. In the action the lienholder, or his agent, or both, shall be liable for the delivery of the release and for all costs and expenses in connection with the bringing of the action, including reasonable attorney fees. (Emphasis added.)

Green asserts that the Taylors did not have standing to file a claim under section 7–106 because they were not "person[s] responsible for the disbursement of funds." The Taylors respond:

It is undisputed that the Appellant is a lawyer. He was assigned the notes, he said, for the purposes of collection. Appellant, therefore, was the holder of the lien on real property as set forth in the statute.

We are not persuaded by the Taylors' argument because it ignores the requirement in subsections (d) and (e) that the person bringing the action be a "person responsible for the disbursement of funds in connection with the grant of title to the property[.]"

In reaching our conclusion, we first look to the principles of statutory construction. In construing a statute, our task is to discern and effectuate the intent of the Legislature. *See F.O.P., Montgomery County Lodge No. 35 v. Mehrling,* 343 Md. 155, 173–74, 680 A.2d 1052 (1996). "The words actually used in the statute, and their 'plain meaning' are the best indicator of that intent." *State Dep't of Assessments and Taxation v. Maryland–Nat'l Capital Park and Planning Comm'n,* 348 Md. 2, 11 n. 9, 702 A.2d 690 (1997). When a statute is silent with respect to an issue, we should consider its purpose in construing it to address that issue. *See Papillo v. Pockets, Inc.,* 119 Md.App. 78, 87, 704 A.2d 448 (1997). "[W]e construe the statute as a whole, interpreting each provision of the statute in the context of the entire statutory scheme." *Blondell v. Baltimore City Police Dep't,* 341 Md. 680, 691, 672 A.2d 639 (1996). The statute should be construed so as to avoid an "illogical or unreasonable result, or one which is inconsistent with common sense." *Tucker v. Fireman's Fund Ins. Co.,* 308 Md. 69, 75, 517 A.2d 730 (1986). "If there is no

clear indication to the contrary, and it is reasonably possible, a statute is to be read so that no word, clause, sentence or phrase shall be rendered surplusage, superfluous, meaningless or nugatory." *Thomas v. Police Comm'r of Baltimore City,* 211 Md. 357, 361, 127 A.2d 625 (1956).

The first principle of statutory construction, that we should look to the plain meaning of the words of the statute, guides our decision in this case. *See Langston v. Langston,* 366 Md. 490, 784 A.2d 1086, 2001 Md. Lexis 866, *37 (2001) (when the legislative intent is evident from the statutory test, plain meaning governs our interpretation). Subsection 7–106(e) clearly limits who is entitled to enforce its provisions, and under what circumstances, by providing that "[T]he person responsible for the disbursement of funds in connection with the grant of title to the property ... may bring an action[.]" The plain meaning of these words tells us that subsection (e) only applies in the context of a real estate settlement, in which there is a conveyance of title and a "person responsible for the disbursement of funds" from that settlement is responsible for the payment of the deed of trust or mortgage from settlement funds.

The legislative history of subsections (d) and (e) is consistent with these plain words. The preamble to 1984 Md. Laws, ch. 497 recites that the act is

[for] the purpose of providing that **under certain circumstances** an agent of a person who has a lien on real property is required to furnish an executed release of lien on the property; providing that an action may be brought and liability may be assessed against a holder of a lien on real property or an agent of a holder who fails to provide an executed release of lien **under certain circumstances**.... (Emphasis added.)

This preamble reinforces our conclusion that an action may be brought under section 7–106(e) and "liability may be assessed" against a lien holder only under "certain circumstances." In other words, the provisions of section 7–106(e) allowing for an action to be brought and attorney's fees

assessed is not intended to apply to every circumstance in which a lien holder is paid off.

' The reason for limiting subsection (e) to situations in which the action is brought by an attorney or other person responsible for the disbursement of funds in connection with the grant of title to property was explained in *Att'y Grievance Comm'n v. Lockhart*, 285 Md. 586, 403 A.2d 1241 (1979). In *Lockhart*, the Court of· Appeals expounded on the legislative purpose underlying section 7–106. The Court explained that this was one of the statutes that was enacted as a result of a scandal that arose in the Washington, D.C. area involving real estate settlement attorneys and delay in real estate settlements. *See id.* at 588 n. 2, 403 A.2d 1241.

One of the remedial provisions enacted was the section 7 106(b) requirement that every person "who has undertaken responsibility for the disbursement of funds in connection with the grant of title to property" has the obligation to either: (1) disburse all funds from the closing transaction within five days of the delivery of a deed, or (2) send to the vendor or purchaser within 30 days of delivery of the deed a copy of a release of any mortgage or deed of trust which the person was obliged to obtain. *See id.* Under section 7–106(b), "if the recording of the release is delayed beyond the 30 day period for causes not attributable to the neglect, omission, or malfeasance of the person responsible for the disbursement of funds, a letter explaining the delay shall be mailed or delivered to the vendor and purchaser within the 30–day period, and .... every 30 days [thereafter] until the required evidence of a recorded release is mailed or delivered to the purchaser and vendor." *Id.* The obvious intent of the legislature was that, with the imposition of these additional obligations for obtaining releases of liens, those persons holding settlements should be accorded the right to recover attorney's fees from a lien . holder who fails or refuses to provide the release.

██ The Taylors were clearly not "person[s] responsible for the disbursement of funds in connection with the grant of title to the property[.]" There is no evidence that their payment of

the indebtedness was even part of a real estate closing in which they acquired their property. The closing on the acquisition of their property had been completed some time previously. The Taylors are simply the debtors under a note secured by a deed of trust. There is nothing in the language or legislative history of section 7–106 that suggests borrowers who pay off mortgages or deeds of trust, but who are not themselves "responsible for the disbursement of funds in connection with the grant of title to the property," are intended to be included within the provision permitting recovery of attorney's fees under section 7–106(e). Accordingly, the trial court erred in awarding attorney's fees to the Taylors.[4]

## II.

### The Trial Court Did Not Err In Determining That There Was No Default Under The $65,000 Note

Green next challenges the trial court's determination that there was no default under the $65,000 Note. In light of our ruling in section I above, we do not have to consider Green's argument that the Taylors were not entitled to an award of attorney's fees because they were in default. The question of default is material, however, to the question of whether the Taylors are indebted to appellant for the twenty-five percent collection fee that he claims accrued at the time of the Taylors' alleged default.

The default claimed by Green was that Fernstrom failed to pay the attorney's fees generated when Green, at the request of Fernstrom, prepared documentation for the 1998 $200,000 loan. The trial court found that the Taylors did not

---

4. In light of our ruling with respect to the applicability of section 7–106(e), we do not reach the issue, raised by Green, of whether attorney's fees may be awarded to a borrower pursuant to section 7–106 when a nominal sum is due to the lien holder. Nor do we reach Green's argument that the trial court erred when it admitted parole evidence to support appellees' contention that the $65,000 Note was not a secured note. We do not see how the status of the Note as secured or unsecured makes any difference with respect to the existence of a default, and the accrual of a collection fee.

default on the $65,000 Note because it believed both of them when they testified that they never agreed to pay those fees. The testimony of the Taylors provides substantial evidence for this finding. Determining the credibility of witnesses is a task for the finder of fact, and in the absence of clear error, we will not disturb this factual finding on appeal. *See In re Timothy F.*, 343 Md. 371, 379–80, 681 A.2d 501 (1996).

Green contends that, regardless of whether the Taylors agreed to pay his fees for preparing the 1998 loan documents, their failure to do so constituted a default because "the effort to redocument and collect the balances outstanding from Mr. Taylor to Mr. Fernstrom began on or about Thanksgiving in 1998." Thus, Green seeks to characterize the negotiation and documentation of the 1998 loan as attorney's fees incurred in connection with the $65,000 Note. A section of that Note, titled "Late Charges And Other Authorized Charges" provided:

If this is an Instalment–Simple Interest loan, if any portion of a payment is at least seven (7) days past due, the undersigned agree to pay a late charge of 5% of the amount which is past due. On all other loan types, the undersigned agree to pay such late charge if any portion of a payment is at least ten (10) days past due. . . . In addition, as permitted by applicable law, the undersigned agree to pay the following: (1) all expenses, including, without limitation, any and all court or collection costs, and attorneys' fees of 25% of the unpaid balance of this Note, or actual attorneys' fees if in excess of such amount, whether suit be brought or not, incurred in collecting this Note; . . . (4) any expenses or costs incurred in defending any claim arising out of the execution of this Note or the obligation which it evidences, or otherwise involving the employment by the Bank of attorneys with respect to this Note on the obligations it evidences[.]

Green seeks to invoke provisions (1) or (4) above to support his argument that even in the absence of agreement, the Taylors were obligated under the $65,000 Note to pay Green's $2500 fee for the 1998 transaction. We are not persuaded by this argument.

■ The characterization of Green's fees as a collection fee under paragraph (1) is not even supported by the testimony of Green, who described the 1998 transaction as a "new wraparound loan." If the fee was generated in documenting a new loan, then it is not a collection fee for a prior loan that was not in default. Nor can the fees be justified under paragraph (4). The mere fact that the old loans were going to be paid off when the new "wraparound" loan was funded did not mean that the attorney's fees incurred to document the new loan were "involving" the $65,000 Note, "arising out of [its] execution" or incurred "with respect to" that Note. This is particularly so in light of the absence of any default under the $65,000 Note at the time of the 1998 transaction. If there had been a default, and the 1998 loan had been made in the course of a "work-out" of the defaulted loan, our view might be different.

Green also seeks to invoke the provision of the $65,000 Note making it an event of default if the lender "deems itself insecure." The trial court implicitly rejected this defense when it found no default under the Note. The only testimony supporting this claim was that of appellant, who stated that Fernstrom "felt insecure, just the arguments raised as we speak are going to be raised again in Mr. Taylor's attempt to try to avoid making payments that he was obligated to make." When Fernstrom testified, however, he did not remember this as a reason for declaring a default. He assigned the failure to pay Green's $2,500 fee as the reason the loan was declared in default. When asked whether there was any other reason, he said, "I think there was one other reason for a default, but I can't recall it right now."

The trial court, upon hearing this equivocal testimony, may not have believed that Fernstrom, in fact, felt insecure at the time he declared the default. It may well have believed that the concept of "lender insecurity" originated with Green as an after-the-fact legal justification for declaring a default, and thereby increasing the amount owed. For a lender to successfully invoke the default clause on the grounds of "lender insecurity," it must, in fact, consider itself insecure. Given the trial court's finding that no default existed, we must assume

that it rejected appellant's evidence on this issue.[5] *See Carling Brewing Co. v. Belzner*, 15 Md.App. 406, 411–12, 291 A.2d 175 (1972) (appellate court assumes truth of all evidence and of all favorable inferences fairly deducible therefrom tending to support the trial court's factual conclusions).

## III.

### The Trial Court Did Not Err In Adopting The Proposed Findings Of Fact And Conclusions Of Law Asserted In The Taylors' Post–Trial Memorandum

Maryland Rule 2–522(a) requires that, "[i]n a contested court trial, the judge, before or at the time judgment is entered, shall dictate into the record or prepare and file in the action a brief statement of the reasons for the decision and the basis of determining any damages." In this case, the trial court issued a written "Order of Court," in which it recited background facts, and stated that it "[found] witnesses Larry and Karen Taylor fully credible." It then "formally adopt[ed] as its findings of facts and conclusions of law 'Plaintiff's Memorandum' as if fully set [forth] herein." Green objects to this latter step, arguing that "[n]umerous errors were injected into the trial court's order, as a result of the trial court having adopted the Plaintiff's Memorandum argument on a verbatim basis." He raises only three specific instances of these alleged errors. Two of the three relate to the issue of whether the note was secured or unsecured, an issue we do not need to reach. *See infra* n. 4.

---

5. Appellant also contends that the trial court failed to "provide a direct decision with relation to the contractual counterclaim of the Appellant." He does not provide a copy of the counterclaim in the record extract, as he should have. *See* Md. Rule 8–501(c). It appears, however, that his counterclaim represented a claim for the balance due on the $65,000 Note, which would be the twenty-five percent collection fee discussed above, plus interest claimed on this amount. Because the trial court found no default, appellant was not entitled to a collection fee. The court's ruling on the issue of default necessarily resolved the counterclaim, and no further resolution is necessary.

 The third instance is the statement in the "Plaintiff's Memorandum" that "Mr. Fernstrom testified that the only reason for the entry of default in January 1998 was the refusal of the plaintiffs to pay an attorney's fee to Mr. Green." Green points out that Fernstrom also testified that "I think there was one other reason for a default, but I can't recall it right now." We have already said that the trial court implicitly rejected the testimony by appellant that Green had declared the default because of "lender insecurity." There is no requirement that the trial court recite, in its decision, exactly the testimony of every party on every subject. Nor is there a requirement that it make detailed findings on every fact in dispute. The trial court may well have seen no meaningful difference between testimony that the only reason for declaring a default was the failure to pay the $2,500 fee, and Fernstrom's actual testimony that there was, in addition, some other, forgotten reason. It is apparent that the trial court was not persuaded that Fernstrom relied on "lender insecurity" as a reason for default. We see no error in the court's adopting Plaintiff's Memorandum as a method of elaborating on his factual findings and legal reasoning.

## IV.

### The Trial Court Erred In Granting The Taylors' Motion To Amend The Judgment Without A Hearing, But The Error Was Harmless

Finally, Green asserts that the trial court violated Md. Rule 2–311(e) by failing to hold a mandatory hearing prior to granting appellee's motion to amend the judgment. Md. Rule 2–311(e) provides: "When a motion is filed pursuant to Rule . . . 2–534, the court shall determine in each case whether a hearing will be held, but it may not grant the motion without a hearing." Md. Rule 2–534 outlines the procedure for filing a motion to alter or amend a judgment.

The Taylors filed a timely motion to amend the trial court's order on August 31, 2000. Green filed a memorandum in opposition to the motion on September 14, 2000. Green also

requested a hearing on the motion. By order dated September 13, the trial court granted the Taylors' motion without convening a hearing, which resulted in an amended order being filed September 15, 2000. Thus, the trial court violated Rule 2–311(e), by granting the Taylors' motion to amend the judgment without affording Green a hearing. In light of this procedural error, we must determine whether the failure of the trial court to hold a hearing prior to granting appellees' motion was harmless error. We hold that it was.

"Unless an appellant can demonstrate that a *prejudicial* error occurred below, reversal is not warranted." *Bradley v. Hazard Tech. Co.*, 340 Md. 202, 206, 665 A.2d 1050 (1995)(emphasis added). Thus, we must assess whether the trial court's failure to convene a hearing was prejudicial in any way to Green. In order to make this determination, we must look carefully at the substance of the Taylors' motion, and precisely what they were asking the court to change in the original order. The Taylors' motion to amend points out that the original order of the court "inadvertently fails to recite the assignment of the $200,000.00 Modification of the Note between [the Taylors] to [Fernstrom]." The Taylors requested that the trial court amend the judgment to reflect that further assignment of the Note to Fernstrom. Thus, the motion was aimed at simply ensuring that the order was an accurate reflection of the relationship between the parties. The granting of the motion did not prejudice Green any more than the original order of the court. Therefore, we conclude that the error was harmless.

**JUDGMENT AWARDING ATTORNEY'S FEES TO APPELLEES VACATED. JUDGMENT ORDERING THAT THE DEEDS OF TRUST ARE PAID IN FULL AND MUST BE RELEASED AFFIRMED. COSTS TO BE PAID ONE HALF BY APPELLANT AND ONE HALF BY APPELLEES.**